ORRELL et al. v. WILMINGTON IRON WORKS, Inc.,

No. 316.

United States District Court
E. D. North Carolina,
Wilmington Division.
March 27, 1950.

George Rountree, Jr., Wilmington, N. C., Rodgers & Rodgers, Wilmington, N. C., for libellant and cross-respondent.

James & James, Wilmington, N. C., John W. Oast, Jr., Norfolk, Va., for respondent and cross-libellant.

GILLIAM, District Judge.

At the outset it is necessary to determine the legal nature of the relationship between the parties at the time of the sinking of the dredge. Was it a bailment for mutual benefit, as the libellant asserts? If so, it is agreed by the parties that there rested on the respondent the legal duty to exercise reasonable care for the preservation of the bailed property. Or did the arrangement amount merely to a permit or license granted by respondent to libellant at its request and for its sole benefit, the libellant retaining constructive possession and control and impliedly assuming full responsibility of care and protection of the property? If so, the parties agree that the libellant must fail as in such case respondent owed no duty of protection to or care of the property. In the Court's opinion, the facts show an implied bailment.

The owner of the dredge, desirous of having certain repairs made, to-wit, replacing the smoke box, requested respondent to advise what it would charge to make these repairs. The owner being given the option by respondent of having repairs made at its own dock, or that of respondent, chose the latter as the cost would be less, and thereafter moved the dredge to respondent's dock and tied it up. While tied there and while the repairs were being made, the sinking occurred. During the progress of the work the owner, libellant, upon suggestion of respondent that the occasion was a favorable one for scaling or flushing out the boiler, sent its employees to do this work. Also, after the repairs were begun it was found that some of the boiler tubes should be replaced and libellant's employee boarded The Fulton for the purpose of delivering new tubes to be installed. It is not claimed, though, that this work or boarding of the vessel to deliver the tubes had anything to do with

the sinking, or that it in any way affected the repair work in progress. Certainly, there is no evidence to support such claim. After the sinking occurred the owner took measures designed to lessen the damage to the dredge while it was submerged; that is, it had pilings driven down at certain points beside the dredge to hold it secure.

■ A bailment is comprehensively defined as "A delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it, as the case may be." 8 C.J.S., Bailments, § 1, page 222.

In contending that the relationship of bailor and bailee was not created, the respondent raises two questions and cites cases in support of its position on both.

■ First, the respondent asserts that there was not a sufficient delivery of the dredge and cites Wells v. West, 212 N.C. 656, 194 S.E. 313, 315, where it is held: "To constitute a bailment there must be a delivery by the bailor and acceptance by the bailee of the subject matter of the bailment. It must be placed in the bailee's possession, actual or constructive."

■ The position that there was no acceptance of the dredge cannot be sustained. The evidence as to whether a representative of respondent was present when the dredge was docked is conflicting, but it is unnecessary to resolve this conflict inasmuch as respondent undertook to make the repairs after the dredge had been docked and this being true there was a full acceptance by implication.

■ The respondent also claims that there was not a full transfer of the dredge so as to "give the bailee for the time being the sole custody and control thereof", and cites Wells v. West, above, where it is written: "* * * There must be such a full transfer, actual or constructive, of the property to the bailee as to exclude the possession of the owner and all other persons and give the bailee for the time being the sole custody and control thereof." The

respondent lays great stress on the undisputed evidence that the owner was permitted to board the dredge to scale the boiler and deliver the boiler tubes, and that after the sinking the owner took measures to mitigate the damages. It appears clear that what happened after the occurrence cannot change or affect the relationship which existed prior thereto, and it appears almost as clear to the Court that the mere fact of permitting the owner for its accommodation to board the dredge for purposes unrelated to the repair work being done by respondent, and which clearly did not contribute to the disaster, is not sufficient to justify the conclusion that thereby the respondent was relieved of all responsibility of care and protection. It must be held that "for the time being the sole custody and control" of the dredge for the purposes of making the repairs was entrusted to the respondent and that during the period of making the repairs the duty of care and protection was imposed upon the respondent.

So we come to consider whether the libellant has carried the burden of establishing that respondent failed to exercise ordinary or due care in caring for and protecting the bailed property. If not, it is not entitled to recover.

■ The facts established by all of the evidence in the case warrant no inference of fault on the part of respondent. The repairs which were to be made to the dredge and which were in progress at the time the dredge sank were of such nature as to involve no risk to the vessel. As a matter of fact, libellant makes no contention that the sinking resulted from the manner in which the repairs were being made or that the disaster was related in any way to the work which was being performed on the dredge. In the pleadings the libellant, rather than rely upon the doctrine of res ipsa loquitur, sets down specifically two respects in which it contends respondent to be negligent; (1) dumping the water from the boiler into the hold, and (2) failure to notify libellant in time for it to save the dredge. As to the first, there was no evidence at all to substantiate the libellant's view; the uncontradicted evidence

established that this did not occur and on the oral argument the contention was abandoned; the remaining contention, while not consistent with the relationship of bailor and bailee which the Court finds to have existed, will be considered as equivalent to the contention that respondent should have maintained a more careful and attentive watch upon the vessel.

It is not unreasonable for libellant to argue that if a more attentive watch had been afforded by the respondent the precarious plight of the vessel could have and would have been discovered in time to save it. Whether this was to be accomplished through the efforts of the bailee or through those of the bailor does not matter. The question of liability, in the Court's opinion, turns on whether it was negligence on the part of the bailee to fail to afford such watchfulness; or, put in another way, was it the duty of the bailee to provide a more attentive eye to the vessel and was the failure to do so the proximate cause of the disaster? This question obviously involves a determination of how much earlier the vessel's predicament must have been discovered in order to have given sufficient time to save her. Neither party offered substantial evidence to show how much additional time would have been required and any attempt to estimate it, it appears, would be guessing. It is illogical to believe that the dredge would have gone down in any event, regardless of when her condition was learned and it is assumed that watchfulness of a degree would have avoided the disaster. What degree? 8 C.J.S., Bailments, § 27, page 273: "Failure to provide a watchman is not negligence as a matter of law * * *. If, however, a loss by fire is such a danger to the property as should have been foreseen by a person of ordinary prudence, then it is the duty of the bailee to exercise such precautions to prevent a fire as ordinary care requires". And in this case, if the loss by sinking was such a danger as should have been foreseen by a person of ordinary prudence, it was the duty of bailee to exercise such precaution to prevent it as ordinary care required:

The respondent afforded only a casual degree of attention, believing perhaps that the vessel was under the control of the owner. As above pointed out, the relationship between the parties was that of bailor and bailee and the law fixed the bailee with the duty of exercising due and reasonable care for the protection of the bailed property, and the burden of proving the failure to exercise such care is put upon the bailor.

There are numerous cases holding that upon proof of bailment and failure of the bailee to return makes out a prima facie case, but it is held generally that in the final analysis the burden rests upon the bailor to prove negligence when the facts are before the Court or the jury. When this stage is reached the prima facie case or presumption disappears and unless the facts preponderate in favor of the bailor he must fail. This is certainly the case where, as here, the bailor sues in tort and specifically alleges acts of negligence. 6 Am.Jur., page 446: "Where an action in respect of the thing bailed is brought by a bailor against his bailee in tort, and the complaint expressly alleges negligence on the part of the bailee or is construed as stating a cause of action based on negligence, the weight of modern authority supports the rule that the ultimate burden of proving negligence rests upon the bailor, and if, at the close of all the evidence, the jury is in doubt whether due care was exercised, the bailor will fail * * *. This rule is generally supported where the fact is assumed, conceded, or established by proof that the property bailed was stolen, injured or destroyed by fire, or injured, or its return prevented by some other cause which, in itself, warrants no inference of fault on the part of the bailee. The plaintiff in such a case is not relieved of his burden of proving negligence upon the whole case merely because there may be a presumption of negligence on the part of the defendant. This burden does not shift, though the bailor, in seeking to excuse its failure to redeliver the property, may disclose circumstances which in their nature permit or require the

inference of negligence on his part." Beck v. Wilkins-Ricks Co., 179 N.C. 231, 102 S.E. 313, 9 A.L.R. 554. So for the Court the question is whether on all the evidence the bailor has carried the burden of showing a lack of due care. The Court has found that the sinking of the dredge was not caused by the negligence of respondent. A decision of this question would be more simple if there were proof of custom and usages in such dealings, but the answer must come without this help as there was no evidence of this character. As stated in 8 C.J.S., Bailments, § 27, at page 271: "The business of the bailee, and the influence of custom and usages in that business must also be considered in determining what is ordinary care, as in certain businesses or trades disposition may be made of property or goods by a man of ordinary prudence which, under other circumstances, would certainly be open to the charge of gross negligence." There being no light furnished on this subject, the Court in attempting to find the answer which does justice to the parties is left to the application of general considerations which should control the actions of a man of ordinary prudence who is entrusted with the care of property of considerable value.

 The Cape Fear River where the vessel was docked and where it sank is not a body of water upon which one would reasonably expect the conditions to become suddenly such as to sink a vessel in waterworthy condition which five days before had been moved along the river under its own power to respondent's dock and which at that time was shipping no water. Besides, respondent did not hold itself out as a shipyard equipped to protect a vessel against a disaster of this kind and libellant was fully familiar with this fact. It is true that some time before the moment when it was learned that she was going down the respondent's manager discovered a hole 8 x 18 inches in her hull, but this hole was 3½ feet above the water line and as this condition was not called to respondent's attention and as the vessel had been moved along the river shortly before the disaster without shipping water it was not a lack of ordinary care for respondent

to assume that the condition constituted no threat to the moored vessel under conditions ordinarily prevailing or even as they existed during the late afternoon and night before she went down. In addition, it would be guessing to say that this hole in the hull caused the vessel to take the water which in turn caused her to sink. There is no proof of it. In fact, to both the libellant and the respondent, as well as to the Court, the cause of the unfortunate occurrence, that is, the cause behind the sudden and rapid shipping of water by the dredge, is left in serious doubt, by the evidence.

### The Cross Libel

The remaining question arises on respondent's claim that it is entitled to recover damages resulting from failure of libellant to raise and remove the submerged vessel. There was no substantial proof of damages on the trial but prior to the call of the case the respondent was assured that evidence of damages would be received later if the decision went to it on the question of liability. Respondent's position is that recovery should be had in any event, either on the basis of a finding of negligence or fault on the part of libellant or in the absence of such finding. As the Court has found a lack of sufficient evidence to establish that the sinking was due to the fault of libellant, the question of liability will be considered only from the viewpoint of what is and was libellant's legal duty, assuming the situation did not come about through his fault.

 The authorities seem to establish that "the lawful owner or occupier of such landing or wharf is entitled to the enjoyment of his property undisturbed by the unlawful overt or negligent acts or omissions of others * * *"; and that if " * * * obstructions are placed there unlawfully, either by the overt act or negligence of another, the owner is entitled to compensation for the loss of his landing, or the expense of removing such obstructions." Fry et al. v. Campbell's Creek Coal Company, 37 W.Va. 604, 16 S.E. 796, 797. But a decision of what duty rests upon the

owner in such situation as has been found to exist here, that is, where the vessel is moored for the mutual benefit of owner of vessel and owner of wharf, and sinks from a cause other than the fault of owner of vessel, is difficult to reach. The estimated cost of raising and removing the vessel is in excess of its salvage value and to add this burden to the loss already sustained by the owner would seem an undue hardship to impose upon one without fault. However, there is the plight of the wharf owner, also found without fault, to consider. In the case of Gulf Coast Transportation Co. v. Ruddock-Orleans Cypress Co., D.C., 17 F.2d 858, it is said: "The policy of the law is to relieve the owner of a sunken vessel from further liability; the theory being that he has suffered a sufficient loss in the loss of the craft and has no further interest in it, provided always that he has abandoned it. The further theory of the law is that, if the sunken vessel is in a location or condition such as to make it an impediment or obstruction or menace to navigation, its disposition or removal is a matter of public concern." Inasmuch as here the submerged vessel does not constitute an impediment or obstruction to navigation no situation of public concern exists. The Gulf Coast Transportation Company case is different from this one, as in that case the vessel lay in a navigable channel and the libel was filed for damages caused by a collision. The question is: Does the policy of law which relieves an owner of a sunken vessel of further liability upon abandonment apply here? This Court holds it applicable. It is argued that there has been no abandonment, as the owner drove pilings around the dredge to secure it. But that was just after the sinking and the subsequent course of action taken by libellant clearly indicates abandonment. He refused to remove the dredge upon demand and took no measures thereafter, except to file the libel alleging negligence of the respondent in causing the sinking.

The Rivers & Harbors Act of March 1899, 33 U.S.C.A. §§ 409, 414, 415, recognizes the right of abandonment given by the general maritime law and Sec. 414 provides that abandonment is presumed after thirty days. The Court's conclusion is that the vessel was abandoned and no liability rested thereafter on the owner to raise and remove.

The facts in Re Highland Navigation Corp., D.C., 24 F.2d 582 are similar to those here. Under permit from the City of New York, the two vessels which later sank were tied up at a pier owned by the city. The city claimed that the owner was liable for the expense of removing the wrecks. The owner of the vessels was found to have been without fault and also to have abandoned the vessels after they sank. It is true that in that case specific notice of abandonment was given—but it seems that abandonment by acts should be sufficient.

In the case just referred to it was held the owner had a right to abandon the vessels and that after abandonment it was relieved from all obligation to remove.

24 F.2d at page 584: "It is well settled that a shipowner whose vessel has been wrecked and sunk without his fault has a right to abandon it, and that after abandonment he is not under any obligation whatsoever to raise or remove it, and is not personally liable for the expense of removal. This is so, though an act of Congress * * * 33 U.S.C.A. § 415, authorizes the Secretary of War to remove obstructions to navigation, and provides that the expense shall be a charge upon the vessel raised by the government, and that, if the owner fails to reimburse the United States * * * the vessel may be sold and the proceeds covered into the treasury of the United States."

24 F.2d at page 585: "Nor is the right to abandon dependent upon the place wherein the vessel lies sunk. In Taylor v. Atlantic Mutual Insurance Co., 37 N.Y. 275, the vessel was accidentally destroyed by fire and sunk while loading at a pier in a slip, and afterwards abandoned. The Court of Appeals said (page 284): 'The place where said wreck was sunk was a part of an arm of the sea, and embraced a portion of the navigable waters of the state. It may be very doubtful whether

the defendants were under any obligation to remove said wreck. The current of authority would seem to show that they were not.' "

The authorities cited by the respondent, and upon which it contends the Court should decree the liability of the owner of the dredge for damages, have been studied. While they lend weight to respondent's contention, the Court is not persuaded to a view contrary to that above expressed.

In accord with this opinion and the findings of fact which are filed herewith, a decree will be entered dismissing both the original libel and the cross-libel, and that costs be divided.

## Findings of Fact

1. The vessel known as The Fulton and owned by the libellant was a non-self propelled combination dredge and derrick rig constructed of long leaf yellow pine in the year 1903 and purchased by libellant in 1941 at the price of $9,000. Her dimensions were, approximately: length, 85 feet; beam, 35 feet; depth, 12 feet; she was equipped with six engines and two centrifugal pumps, one of 12 inches, the other of 8 inches; she had a derrick rig on the bow end which was capable of lifting loads from 75 to 100 tons and which was constructed so as to be used also as a pile driver. The pumping and dredging equipment was located on the stern end.

2. At the times mentioned in the pleadings and in the evidence, the respondent was and continuously since has been engaged in conducting a boiler, machine shop and iron works on the waterfront at Wilmington, N. C., and was also in the business of repairing and installing machinery and engines in various types of vessels; this latter type of work usually was done at its own wharf and place of business in the case of small vessels and vessels of the size of The Fulton; at the times mentioned the respondent did not hold itself out to be a shipyard; it was not equipped to make repairs upon wooden hulls and its maritime activities are and were limited to repairs to machinery, engines and boilers on vessels; it neither owns nor operates tugs or floating equipment; at the time the

agreement hereafter mentioned was made libellant was familiar with the general character of respondent; and knew that respondent was not a shipyard, and did not own or operate tugs or floating equipment, and was not equipped to repair wooden hulls.

3. On the 26th day of January, 1947, in pursuance of a prior agreement between the parties hereto The Fulton was taken by her owner to the wharf of respondent (about 200-foot frontage), the distance from libellant's berth to the respondent's wharf being approximately four or five city blocks down the Cape Fear River, and moored her at the northern end of said wharf, where she remained until she sank; under the terms of the agreement the respondent was to remove The Fulton's smoke box and install a new one for the contract price of $365; this work was to be performed at the wharf of the respondent because it could be more cheaply done there and the decision whether the work was to be made there or at the libellant's berth had been left to the option of libellant under the negotiations which led to the agreement.

4. On the 28th day of January, 1947, respondent's foreman found a large quantity of rust and scale in The Fulton's boiler and libellant was asked if he wished the respondent to clean out the rust and scale or wished to do this work himself; libellant elected to do the work and thereafter had it done by his employees at respondent's wharf; the performance of this work in no way contributed to the sinking later mentioned.

5. Subsequent to the mooring of The Fulton at respondent's wharf respondent advised libellant that some of the boiler tubes should be replaced and thereupon libellant's employee boarded The Fulton and placed thereon some boiler tubes to be used by respondent in replacing some of the old tubes in the boiler; in so doing the libellant's employees had free access to The Fulton and did not have to obtain the permission of respondent to board her; on this occasion libellant's employees did no act which might have contributed to the sinking.

6. Prior to the time when The Fulton was taken to respondent's wharf it had been tied up at libellant's berth and had been out of service since the latter part of 1944; she had not been drydocked since 1943; at the time when The Fulton was moved to respondent's wharf she was in waterworthy condition for the river, though her decks were not watertight and there was a hole about 8 inches wide and from 16 to 18 inches long in her stern, which hole was about halfway between the deck and the water line and about 3½ feet above the water; at this time she was not noticeably leaking; the door to the deck housing, located in the aft bulkhead of the housing, did not have a coaming and water which came over the stern was free to run into the deck housing, thence through an open hatch into the hold; the condition of The Fulton, except that there was a hole in the stern, was known to respondent when the repair work was begun and no objection was offered.

7. A day or two after The Fulton was taken to respondent's wharf, work was commenced upon the installation of a new smoke-box and thereafter upon the installation of new boiler tubes and continued until the work was stopped by the sinking of the dredge at respondent's wharf during the night of January 30, 1947.

8. During the day of January 30, 1947, the weather, which had been good, began to worsen and continued to grow worse constantly during the day and night; by 11:00 p. m. on the night of January 30 the wind had reached a maximum velocity of 20–27 miles per hour from the west; at midnight the wind was from the south and its velocity was 25 miles per hour. Later, between 1 o'clock and 2 o'clock a. m. of January 31, the prevailing wind was southwest with an average velocity of 20 miles per hour; between 11:00 and 11:30 p. m. of January 30, 1947, The Fulton was discovered in a sinking condition by respondent's watchman, and libellant was immediately notified through the Police Department of the City of Wilmington; within approximately 30 minutes after notice to libellant his employees arrived at The Fulton with a six-inch portable gasoline pump.

It was too late, and The Fulton sank in about 15 feet of water at respondent's wharf.

9. The repair work had not been completed at time of sinking, but that part which had been done was done properly and in no manner contributed to the sinking.

10. During the time The Fulton's machinery was being worked on at respondent's wharf, respondent's Superintendent of work-in-process saw her from time to time each day and he first observed the hole in her stern or southern end, as she lay moored at respondent's wharf, either on January 27 or January 28, 1947; he went aboard The Fulton at least once a day during the progress of the work; the respondent's boiler shop foreman was constantly supervising the work being done on The Fulton's engines and he observed at about 4:30 p. m. on January 30, 1947 that the weather conditions were worsening, the wind had risen, and the tide had fallen; the watchman at respondent's place of business observed during the night of January 30, 1947 that the river was becoming rough, and the weather very bad, and the wind rising; while making his round between 11 and 11:30 p. m. he saw that The Fulton seemed to be settling in the water and that the waves were breaking over her and that the river was really rough; it was at this time that the watchman notified libellant through the Police Department. The respondent's watchman, being unable to read, could not find libellant's telephone number in the directory and so caused the notice to be given through the Police Department to which, under the custom prevailing, he was required to report hourly during the night. Earlier the watchman had noticed the waves hitting the stern of The Fulton rather hard and thereafter kept close watch of her condition.

11. The respondent was not equipped with pumps at its wharf or with any other safety devices for saving vessels which might get into distress there, and libellant was aware of such situation, and at the time in question respondent did not request that pumps be placed by libellant on

The Fulton, though the respondent knew that The Fulton was equipped only with pumps operated by her own steam boilers which were out of commission on account of the work in progress; respondent had in its employment only one watchman whose duties did not require him to care for the safety of vessels moored at the wharf; the notice which the watchman caused to be given to libellant was as an accommodation and not in the line of duty or in accordance with any instruction.

12. The respondent's wharf runs north and south and has about 15 feet of water at the northern end where the dredge was moored and somewhat less water towards the southern end; the northern end is capable of handling large tugs and a number of tugs of about 147 gross tons were maneuvered in and out of the wharf and moored within a few feet from The Fulton while there.

13. On February 3, 1947, the libellant wrote to the respondent asserting that the sinking was due to the respondent's negligence; to this the respondent replied, denying any liability for the sinking and calling upon libellant to remove the sunken dredge. On February 7, 1947, libellant replied, agreeing to remove the dredge providing respondent would pay for the cost of raising and removing and would pay for any damage to the machinery of the dredge, and a reasonable rental for the loss of its use. There was no reply to this letter; sometime after the sinking libellant had pilings driven around The Fulton, two clusters on the outboard side, one at the north and one at the south end, four pilings in each cluster, with timbers across the caps of the pilings and approximately three pilings on the inboard side between the dredge and the wharf. These pilings were installed for the purpose of securing the position of The Fulton where it sank.

14. The sinking of the dredge was not due to the negligence of the respondent.

15. The value of The Fulton at the time she sank was $9,000; the cost of raising The Fulton and restoring her to her condition prior to the sinking would be in excess of this amount.

16. There is no substantial evidence of damages to libellant arising from loss of use of the dredge.

17. The Cape Fear River at the point where the sinking occurred is a navigable stream, but the sinking did not occur in the navigable channel and the situation has not and does not obstruct navigation.

18. Though the dredge when moored at respondent's wharf was in bad condition as found above, such condition was obvious and it does not appear from all the evidence that the disaster was due to the fault or negligence of the libellant, or that if libellant was at fault such fault was of greater degree than the fault of respondent.

19. The acts and conduct of libellant amounted to an abandonment of the dredge prior to the filing of the libel.

## Conclusions of Law

1. At the time the dredge sank and for the period while it was moored at respondent's wharf the respondent was a bailee for mutual benefit of the parties.

2. The sinking of the dredge was not caused by the negligence of respondent.

3. The sinking of the dredge was not caused by the negligence of libellant.

4. The libellant was and is under no legal obligation or duty to raise and remove the dredge: therefore, is not liable for damages to respondent.

5. A final decree will be entered adjudging:

a. That both the libel and cross-libel be dismissed.

b. That cost be divided.