### ORRELL v. WILMINGTON IRON WORKS, Inc.

No. 6147.

United States Court of Appeals Fourth Circuit.

Argued Oct. 11, 1950.

Decided Nov. 10, 1950.

182

H. E. Rodgers and George Rountree, Jr., Wilmington, N. C. (Rodgers & Rodgers and Rountree & Rountree, all of Wilmington, N. C., on brief), for appellant and cross-appellee.

Murray G. James, Wilmington, N. C., and John W. Oast, Jr., Norfolk, Va., for appellee and cross-appellant.

Before PARKER, Chief Judge, DOBIE, Circuit Judge, and TIMMERMAN, District Judge.

DOBIE, Circuit Judge.

J. D. Orrell, trading and doing business under the style and name of Cape Fear Towing Company, filed a libel in admiralty in the United States District Court for the Eastern District of North Carolina against the Wilmington Iron Works, Incorporated. Wilmington Iron Works filed cross-libel against Orrell. Libellant sought to recover the value of his combination dredge and derrick rig, the Fulton, and for loss of use of the Fulton. The Fulton sank while moored at respondent's dock when undergoing repairs by respondent. The cross-libel sought damages for the loss of the use of a section of respondent's wharf which was blocked by the sunken Fulton.

The District Court dismissed both the libel and the cross-libel. Its opinion is reported in 89 F.Supp. 418. Both libellant and respondent have appealed to us.

The Fulton had been out of commission at libellant's place of business for some months. Libellant desired that certain repairs be made on the boiler-tubes and smoke-box of the Fulton. Mintz, Superintendent of respondent, agreed to make these repairs, and it was also agreed between Mintz and Orrell that Orrell would take the Fulton, which was without motive power, to respondent's wharf on the Cape Fear River, where the repairs were to be made. On January 27, 1947, libellant had the Fulton towed to, and moored at, respondent's wharf. Libellant testified that Mintz was on the dock when the Fulton was thus moored, that libellant asked Mintz "if it was tied up satisfactory and he answered 'O.K.'." Mintz denied this, but it was clear that no complaint was made by respondent as to the mooring, and respondent went to work repairing the boiler-tubes and smoke-box of the Fulton.

Mintz testified that when he first went on the Fulton after it was moored at respondent's wharf, which was either January 27 or January 28, he noticed a hole in the Fulton's stern, about eight inches wide, fourteen to eighteen inches long and about eighteen inches above the water line. The District Court found that this hole was about three feet, six inches above the water line. According to Mintz, the appearance of this hole indicated that it had not been recently made. Libellant and his nephew, superintendent for libellant, both testified that there was no hole in the Fulton when it was moored to respondent's wharf and that no one connected with libellant ever heard of the existence of this hole until the day of the trial.

On January 30, 1947, there was a mild storm and rain on the Cape Fear River. Several of respondent's employees admitted

knowledge of this, when they stopped work. United States Weather Bureau reports for that day show winds between 10 P.M. and Midnight with a velocity of approximately twenty-seven miles per hour. There was testimony of waves on the river over four feet in height. Ganous, respondent's watchman, stated: "It was rough. The weather was rough and a terrible wind. It looked like everything was going to tear to pieces the way the weather was."

Shortly before or after midnight on January 30, Ganous, who was illiterate and unable to read the telephone book, managed to phone Orrell through the good offices of the police department. Ganous informed Orrell: "You had better come down and look after your barge. It is sinking." Ed Orrell, with another man, reached the barge in about thirty minutes after this telephone call. These two, with a pump they had brought, made desperate but fruitless efforts to save the dredge, which speedily sank, at about one-thirty A.M. on January 31.

■ We must uphold the finding of the District Court that there was a bailment of the Fulton. Since the object of the bailment was to secure the services of respondent in repairing the boiler-tubes and smokebox of the Fulton, for which libellant (bailor) was to pay respondent (bailee), the bailment was one for mutual benefit of the bailor and bailee, the old *locatio operis faciendi*. As the District Judge stated: "The position that there was no acceptance of the dredge cannot be sustained." [89 F.Supp. 418, 421.]

■ During the making of the repairs, respondent notified libellant that there was scale in the boiler and asked if respondent should remove this scale or whether libellant would attend to this. Libellant sent an employee to the Fulton and the scale was quickly removed. There is utterly no merit in respondent's contention that this, in any way, affected the existence of the bailment relation. There was a complete delivery of the dredge and actual possession and control of it by respondent. See Wells v. West, 212 N.C. 656, 194 S.E. 313; Dobie on Bailments and Carriers, §§ 9–10.

■■ Unless it is stipulated otherwise, a bailment of mutual benefit imposes upon the bailee the duty of ordinary care, which means that he must exercise the same degree of care that a man of ordinary prudence would exercise under similar circumstances. This was respondent's duty. Any failure on the bailee's part to exercise this degree of care is negligence which renders the bailee liable to the bailor for all damages proximately flowing therefrom.

■■ "There is no little confusion among the decisions in regard to the burden of proof in cases where the bailee is sued by the bailor for loss of, or injury to, the bailed goods. It seems accurate, according to the weight of authority, and also on principle, to say that, since the negligence of the bailee is a fact upon which the bailor's right to recover is based, the burden of proof as to such negligence rests at the outset on the plaintiff bailor, and remains on him all during the trial. But by proving that the goods were delivered to the bailee in good condition and that they were returned in a damaged condition or not returned at all, the plaintiff thereby makes out a prima facie case of negligence, and thus imposes upon the defendant bailee the duty of going forward with the evidence under penalty of losing the suit. Hence a mere showing of loss or injury will entitle the plaintiff bailor to recover, unless this is offset by evidence adduced by the defendant bailee. The bailee, though, may overcome the prima facie case, thus made out on the part of the bailor, by proving affirmatively that he exercised that degree of care which the bailment in question called for, or that the loss or injury was due to causes in no way connected with the lack of proper care on his part. Such a showing will then prevent a recovery by the bailor for the loss or injury, the loss or injury then falling on the bailor under the principle res perit domino. Proof of loss or injury, standing alone, accordingly constitutes as to negligence the preponderance of evidence required in civil causes to make out a case.

"The justification for this rule is found in the fact that experience shows, in the great majority of cases, that the exercise by the bailee of the particular degree of care which the bailment demands will be sufficient to prevent the loss of, or injury

to, the bailed goods. Another, and perhaps a stronger, reason is that the bailee, in possession and control of the goods, has the fullest opportunities of knowing just how the loss or injury occurred, while just the opposite is true of the bailor.

"The rule given above is sometimes termed the modern rule, because it has the overwhelming support of the modern cases. There are quite a few cases, most of them old, though, holding that proof of loss or injury alone does not even make out a prima facie case against the bailee, on the ground that the law tends to presume one diligent rather than negligent, and that therefore the bailor plaintiff must go further and connect such loss or injury with some negligent act or omission on the part of the bailee defendant." Dobie on Bailment and Carriers, 117.

See cases therein cited. See, also, Commercial Molasses Corporation v. New York Tank Barge Corporation, 314 U.S. 104, 111, 62 S.Ct. 156, 86 L.Ed. 89; The C. W. Crane, 2 Cir., 155 F.2d 940; Alpine Forwarding Co. v. Pennsylvania Railroad Co., 2 Cir., 60 F.2d 734, certiorari denied 287 U.S. 647, 53 S.Ct. 93, 77 L.Ed. 559; Thompson v. Chance Marine Construction Co., 4 Cir., 45 F.2d 584.

Upon the facts and law, as we see them, we must reverse the decision of the District Court absolving the respondent from liability for the sinking of the Fulton. We think the respondent was clearly liable. Apart from the hole in the stern, the record discloses clearly that she was entirely riverworthy. She was periodically inspected while lying at libellant's place of business. Just when and how this hole came into being is far from clear. But all of libellant's witnesses testified that they knew nothing of this hole until its existence was brought out at the trial. Mintz, however, observed the hole when he first went on the Fulton after she was moored at respondent's wharf, more than two days before she sank. Mintz and other employees of respondent knew of the highly unfavorable weather conditions when they quit work in the late afternoon of January 30. They either were; or should have been cognizant of the danger to the Fulton. Yet

no notice of the hole in the Fulton's stern, no warning to libellant of any impending danger, was given until the telephone call by Ganous to Orrell, when it was too late. There was testimony in the record that had earlier warning been given to libellant, the Fulton could have been saved. Nor were any precautions whatever taken which might have averted the disaster.

Ganous testified: "I had no instructions to look after the barge (the Fulton). All the instructions I had to look at was to keep people off the wharf and out from down in there. I called him (Orrell) because I thought it was a favor for him. I thing I was doing him a favor." Ganous further testified:

"Q. You didn't call Mr. Orrell until she was in the process of sinking? A. I done it as a friend. I done it as a friend to him.

"Q. You mean to say vessels moored at your wharf and work done on the machinery and no provisions to watch the vessels? A. My instructions are to keep people off the wharf.

"Q. You would have kept better watch if that had been you duty? A. Yes, sir.

"Q. The first time you thought they were in danger you would have called? A. Yes, sir.

"Q. Nobody there looking after it? A. No, sir.

"Q. No pumps there? A. No, sir.

"Q. No provision for protection of any vessel at your wharf at that time? A. No.

"Q. Don't you know that is a fact? A. Sure."

And, again:

"Q. Did you go on the barge while watching it and take your flashlight and look inside? A. Just before Mr. Ed (Orrell) drove up I stepped up to the manhole (of the Fulton) and flashed my light in there and I could hear the water running in but I couldn't see it. I don't know whether it come from the deck or side."

It seems to us a fair inference that this "water running in" was pouring through the hole in the Fulton's stern.

There is a conflict in the testimony as to just when Ganous put through his telephone call to Orrell. Ganous, on direct

examination, placed the time as about eleven-thirty P.M. on January 30. Police Officer West testified that the call came in and he logged it at one A.M. on January 31. On cross-examination, Ganous testified:

"Q. Would you deny that you talked to Mr. Orrell after one o'clock if the policeman says that was when it was? A. No, I wouldn't .deny it. It might have been that time when I called but I did talk to Mr. Orrell.

"Q. You say the barge had been sinking since eleven-thirty? A. Could have been that way.

"Q. And you called at one o'clock? A. That's when I called according to what he said.

"Q. So the barge had an hour and a half to sink? A. I don't know how long it took it to sink but it was going when I called."

We think then, that respondent (bailee) has failed utterly in its duty to go forward with the evidence to show either that it exercised ordinary care here or that the sinking of the Fulton was due to causes in no way connected with its lack of proper care. We could, if necessary, go further and hold that the evidence of respondent's own witnesses shows that when the surrounding facts (clearly known to respondent) manifestly demanded that some action be taken, respondent supinely did nothing. Respondent was thus shown to be guilty of negligence which proximately contributed to the sinking of the Fulton. Respondent must, therefore, respond in damages for the value of the Fulton at the time of her sinking and for the loss of her use to the libellant. See, Salmon Dredging Corporation v. Herma, 4 Cir., 180 F.2d 233; Charles Pfizer & Co. v. Conners Marine Co., 2 Cir., 175 F.2d 213. Cf. Richmond Sand & Gravel Corporation v. Tidewater Construction Corporation, 4 Cir., 170 F.2d 392.

Our decision that respondent is liable for the sinking of the Fulton naturally requires us to affirm that part of the decree below which dismissed the cross-libel of Wilmington Iron Works.

The decree of the District Court is affirmed in so far as it dismissed the cross-libel.

That part of the decree which absolved the respondent Wilmington Iron Works, Inc., from liability is reversed. The case is remanded to the District Court to enter a decree in favor of libellant Orrell and against respondent Wilmington Iron Works, Inc., for the value of the Fulton when it was sunk, and for the value properly attributable to libellant for the loss of use of the Fulton. The finding of the District Court as to value seems rather low in the light of some of the evidence and is unsatisfactory for purposes of review because not based upon findings as to the primary or evidentiary facts upon which it is based nor is it accompanied by any reasoning in the opinion showing how it is arrived at. The finding will accordingly be set aside and the District Court will go into the question of value more fully and make findings as to the evidentiary facts upon which its valuation is based, with authority to hear further evidence addressed to that issue if the parties desire to offer it.

Affirmed in part; reversed in part and remanded.