**JONES TOWING, INC., Plaintiff,**

v.

**The UNITED STATES of America, Paul A. Lambert, Lambert Marine, Inc., Lambert Gravel Company, Inc., and Lambert Contracting Co., Inc., Defendants.**

**No. 7503.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Oct. 18, 1967.

840

Cornelius G. Van Dalen, Ralph E. Smith, Jack G. Carinhas, Jr., New Orleans, La., for Jones Towing, Inc.

George W. Healy, James H. Roussel, New Orleans, La., for Resolute Ins. Co. and Underwriters at Lloyds, respondent-impleader.

Thomas F. McGovern, Attorney, U. S. Department of Justice, Elaine Chauvin, U. S. Atty., for the United States.

George A. Frilot, III, Eldon A. Harvey, III, R. Boatner Howell, Jr., New Orleans, La., for Paul A. Lambert, Lambert Marine, Inc., Lambert Gravel Co., Inc. and Lambert Contracting Co., Inc.

CASSIBRY, District Judge:

This case involves an interpretation and application of the Rivers and Harbors Act of 1899 [1] and, more specifically, the Sections of that Act commonly referred to as the Wreck Act.[2] There is a basic disagreement over the meaning of pertinent portions of the Wreck Act between the Ninth and Fourth Circuit Courts of Appeal on the one hand and

---

1. 30 Stat. 1121 et seq.; 33 U.S C.A. § 401 et seq.

2. 33 U.S.C.A. §§ 409, 411, 412, 414 and 415.

the Fifth Circuit on the other.[3] The Supreme Court of the United States has granted Writs of Certiorari in the *Cargill* case (supra) and a Writ of Certiorari is pending in the *Moran* case (supra).

■ The Wreck Act generally attempts to define the responsibilities of one who obstructs, impedes or creates a hazard in navigable streams and the responsibility of the United States after it is notified that such an obstruction exists.

This suit was brought on behalf of Jones Towing, Inc., as owner *pro hac vice* of the Towboat Miss Lou against several defendants, including the United States of America and Lambert Marine, Inc., as the owner of the sunken Barge OR-420, alleging that on August 2, 1964, the Miss Lou sank as a result of having struck the OR-420 which was unmarked and unlighted. Lambert Marine, Inc., in turn, impleaded the United States, alleging that it was the Government's statutory responsibility to mark, light and/or remove the sunken barge after its alleged abandonment. The United States impleaded the hull underwriter of the Barge OR-420, alleging it to be the owner of the barge by reason of an abandonment to underwriter and payment to its assured on the basis of a total loss.

I find against the United States and in favor of the Plaintiff and Lambert and the impleaded Underwriters.

Jones Towing, Inc. (hereafter, Plaintiff), was a Louisiana corporation having its principal place of business at New Orleans, Louisiana, and was the barefoot charterer and owner *pro hac vice* of the Towboat Miss Lou. Defendant Paul A. Lambert was a person of the full age of majority and a resident of St. Francisville, Louisiana, and Lambert Gravel Company, Inc. and Lambert Contracting Company, Inc., were Louisiana corporations having offices at St. Fran-

cisville, Louisiana. These parties just named in no way participated in any of the events preceding or following the casualty herein involved and neither owned nor chartered any of the vessels involved in the casualty and, therefore, have no responsibility to the Libellant.

Lambert Marine, Inc. (hereafter Lambert) was a Louisiana corporation having its principal place of business in St. Francisville, Louisiana, and was, at the time of its sinking, the owner of the OR-420. The United States is a sovereign which has by law consented to be sued under the facts and circumstances of this case by reason of the authority of the Suits in Admiralty Act, 46 U.S.C. § 741 et seq.

At the time the OR-420 sank, Lambert was insured with respect to the barge by a policy of hull insurance issued by Respondents-impleaded, Resolute Insurance Company and Underwriters at Lloyds and/or Institute of London Companies (hereafter referred to collectively as Underwriters) in the amount of $6,000.00, said policy of insurance expiring at noon on June 1, 1964. There was no protection and indemnity, or liability coverage afforded by Underwriters.

The OR-420 was an undocumented, steel-hulled, rake ended, open hopper-type barge, 195 feet in length, 35 feet in beam and about 10 feet in depth. The Motor Vessel Miss Lou was a steel-hulled, 3200 horsepower twin screw diesel towboat, 111 feet in length, 30 feet in beam, with a hull depth of about 10 feet, equipped with radar and radio telephone and carrying a crew of twelve men.

■ On or about May 17, 1964, OR-420, loaded with approximately 800 tons of pea gravel, was being pushed along with two other barges by the Tug Theresa Maria downbound in the Port Allen-Morgan City alternate route of the Gulf Intracoastal Waterway. At or near mile 19.25 in the Waterway, OR-420 buckled

3. United States v. Cargill, Inc., 367 F.2d 971 (5th Cir. 1966); United States v. Moran Towing & Transportation Co., 374 F.2d 656 (4th Cir. 1967); United States v. Bethlehem Steel Corp., 319 F. 2d 512 (9th Cir. 1963).

and sank, but not before it had been pushed towards the right descending bank partially into a cove near the pipeline crossing at Belle River. This cove is shown clearly on the aerial photograph of 1966 and on photographs taken of the area both before and after the Miss Lou incident. There was no competent evidence introduced at the trial concerning the circumstances surrounding the sinking of OR-420 other than those facts reported to Paul Lambert, President of Lambert Marine, Inc. His testimony was to the effect that the barge had "seeped water" and had to be pumped dry prior to the voyage on which the sinking occurred, and that she had run aground and was stuck for several hours near Bayou Sorrell, downbound on the Port Allen-Morgan City Waterway. Under these circumstances, it would be impossible to find that Defendant Lambert was negligent in the sinking of the OR-420.

The New Orleans District of the Corps of Engineers, Department of the Army, was notified promptly of the casualty and of the location of the sunken barge. On May 18, 1964, that agency reminded Lambert by telegram of his "responsibility to mark (wreck) for day and night navigation pending removal from the waterway." Having received no response to its telegram of May 18, the Corps of Engineers on June 15 traced Lambert by telegram, repeated the initial communication of May 18, and added "still awaiting your intentions as to a disposition" of the barge. There followed an exchange of telephone communications between Lambert and representatives of the Corps of Engineers regarding abandonment of the barge to the Engineers, removal of the wreck and interim marking. Mr. Ed Keiler of the legal staff of the Corps of Engineers, was acquainted with Mr. Lambert personally. He recommended to Lambert that he hire the Coast Guard to mark the wreck for his account. Lambert was also told that if he wanted to abandon under the general maritime law, he had to put it in writing and send it in to the District Engineer who would investigate it and let him know; that meanwhile, it was Lambert's obligation to mark and light the wreck. Lambert admitted that he was so advised and that he never did give formal notice to the Corps of Engineers that he had abandoned OR-420. However, within 24 hours following the sinking of OR-420, Paul Lambert visited the site of the sinking and marked the location of the sunken barge by use of large watertight cans painted red in color. One was placed in each corner of the barge and chlorox bottles were added to define the outline of the barge when her cargo was removed several days later. These markers were seen by the witness Jeansonne, an inspector for the Corps of Engineers, and are visible in the color photograph taken by Thomas Stanley, a marine surveyor, employed by the Underwriters of the barge.

Within 48 hours following the casualty, Stanley had visited the site of the sinking and, on the basis of the location of the barge and its insured value ($6,000.00), determined that it was economically inadvisable to attempt salvage. It was reported to Underwriters and to Lambert that OR-420 was a constructive (total) loss. There is no credible evidence that following Stanley's report the Underwriters made efforts to salvage the barge or attempted to exercise any proprietary interest over it. Lambert subsequently arranged for a diver to inspect the barge in connection with efforts to remove the cargo from the sunken wreck. Most of the cargo was removed by May 22, 1964, and there was no credible evidence that Lambert made any further attempts to either salvage the barge or to mark or otherwise identify its location. There was credible evidence, however, that Lambert did, on at least two occasions, tell Army Engineers' representative that he intended to salvage. But Lambert did not take any action to carry out that intent.

On July 16, 1964, Lambert's attorney telephoned Stanley to discuss what would be needed to collect the proceeds of the

hull insurance. In addition to the paper forwarded to Lambert on May 22, 1964, Stanley advised that Lambert would have to tender abandonment of the barge to Underwriters if payment for a constructive total loss was to be made. On July 31, 1964, Lambert forwarded to Stanley the loss papers together with a letter tendering abandonment of the barge to Underwriters. On Monday, August 3, 1964, Stanley "tentatively" declined the abandonment on behalf of Underwriters inasmuch as he personally had no right to accept or reject abandonment, the decision being solely that of the Underwriters.

There was evidence that unlighted markers placed around the wreck originally by Lambert were shortly carried away, and neither the Corps of Engineers nor Lambert made any further effort to mark and light the location prior to the Miss Lou casualty.

On August 2, 1964, 76 days following the OR-420's sinking, it lay just beneath the surface of the waterway unmarked and unlighted. Lambert had not formally abandoned the barge to the Corps of Engineers at any time but had demonstrated a lack of interest in it except to salvage its cargo and collect the insurance due. Even when 30 days had passed following the sinking, the Corps of Engineers continued to bicker with Lambert about Lambert's obligation to mark and light.

About 11:00 A.M. on August 2, 1964, Plaintiff's Towboat Miss Lou departed Baton Rouge, Louisiana, pushing the light Barges WG-15, GTC-3, WG-14 and MOS-119, bound for Corpus Christi, Texas, by way of Morgan City-Port Allen alternate route of the Gulf Intracoastal Waterway. Each barge in tow was drawing about one foot of water; the Miss Lou had a draft of about 8½ feet. At 11:45 A.M., the Miss Lou flotilla passed through the Port Allen locks and entered the Gulf Intracoastal Waterway. At 5:40 P.M., the flotilla cleared the Bayou Sorrell locks at Mile 37 on the waterway. Pilot Sheldon W. Morgan was in charge of navigation dur-

ing his watch. He received no notices, bulletins or information of any kind from lock personnel employed by the Corps of Engineers (from whom such information is customarily received) pertaining to navigation of the waterway and the presence of hazards or obstructions therein. Nor did he receive information from the towboat pilots, the United States Coast Guard, or any other source, as to the presence of a wreck or submerged object in the waterway below the Bayou Sorrell locks. Nor did the tugboat captain, Mason Peaden, who had charge of the Miss Lou during the Port Allen locking, receive any such information by word-of-mouth, notice, bulletin or otherwise. The Miss Lou flotilla continued south in the waterway below the Bayou Sorrell locks, favoring the right descending bank. The night was dark, but the weather was clear; radar was in operation, and Captain Peaden was playing two 19-inch carbon searchlights ahead in the unmarked channel.

About 9:00 P.M., while the flotilla navigated a small S-bend in the channel at slow speed, about 50 feet off the right bank, in the vicinity of Mile 19.25, Captain Peaden experienced an "awful grinding" in the Miss Lou's hull, and the vessel "climbed up" on an underwater obstruction. No markers or buoys lighted or unlighted, nor any object in the water was sighted either by eye or radar before or after the casualty. The Miss Lou's engines were stopped immediately, and an examination was made. The barges were undamaged; but Miss Lou's bottom plating was torn open. Shipboard pumps and later assistance from the Coast Guard could not control the influx of water. All machinery was shut down to prevent further damage as the half-sunk towboat lay solidly atop the obstruction.

■ I conclude that the plaintiff proved by a preponderance of the evidence that the object struck by the Miss Lou was the OR-420, and further, that plaintiff was not in any way negligent at the time of the casualty.

The only reasonable conclusion to be drawn from the entire record is that the Miss Lou struck the submerged, unmarked and unlighted wreck of Barge OR-420.

The Corps of Engineers' witnesses, charged with knowledge of obstructions in navigable waters, testified that there was no obstruction or hazard to navigation other than Barge OR-420 in the entire general area below the Bayou Sorrell locks. Engineers' witness Keiler simply stated "Miss Lou ran up on Barge OR-420."

There is no other logical inference; this same wreck spawned further litigation, pending in other divisions of this Court, before the derelict was finally sunk by the Corps of Engineers in a deep dredged hole on the bottom of the waterway in 1967.

In a case now pending in Section "B" of this Court,[4] the United States frankly admits that the Tug Guzetta struck the sunken Barge OR-420 at or near Mile 19 in the waterway.

The Miss Lou, a 500-ton, 3200 horsepower steel towboat, was actually "hung up" on the submerged barge for two days before she could be refloated and moved. Marine Surveyor Nesser, who arrived on the scene shortly after the sinking, boarded the Miss Lou and heard the unmistakable sound of steel grinding against steel on the bottom of the hull. When the vessel was hauled out for repairs, the torn bottom plating bore the telltale evidence of having been punctured by steel. Nesser had observed this familiar physical fact many times before in the course of his experience in the marine industry.

█ The suggestion was made that the Miss Lou might have struck a stump close to the bank, (incredible when the master and pilot found steel all around the boat). The condition of the Miss Lou's bottom damage belies this, and, moreover, a stump in a soft mud bottom such as was the case in this swampy

area, would probably be displaced by the sheer bulk of the Miss Lou's hull before any appreciable damage would be sustained. It is unlikely that a 500-ton vessel would "climb up" from the water and remain "hung-up" on a stump of wood.

The Miss Lou drew 8½ feet of water. With that draft, she could not have navigated close enough to the bank to have fouled upon a stump, which vague testimony suggests may have existed in certain places next to the shore. No evidence was presented to prove this. Obviously, the Miss Lou would have been hard aground before contacting one of these alleged obstructions because the channel is only 125 feet across the bottom, 200 feet wide from bank to bank, and the casualty occurred 50–75 feet from the bank.

The Miss Lou's pilot, Shelton Wayne Morgan, placed the location of the casualty in the precise spot where the Corps of Engineers found OR-420. Morgan was certain of the location because of the presence of two small bends which are indicated on Captain Peaden's sketch. Captain Peaden testified "we took a pole and sounded around the boat and all we could hit was metal and it was definitely a barge of some kind that we were on."

Unfortunately, the barge was never raised and the corpus delicti was ultimately buried by the Engineers 20 feet below the soft mud bottom of the Gulf Intracoastal Waterway, never to be exhumed. But the credible evidence shows that Miss Lou struck OR-420 on the night of August 2, 1964. No other reasonable explanation for the disaster has been advanced.

█ Defendants objected to the use of the depositions of Shelton Wayne Morgan and Mason D. Peaden, the relief captain and captain respectively of the Miss Lou, on the night of the striking. Defendants urged rejection of depositions on ground that deponents lived

4. Alter Company v. Vincent Guzetta, Lambert Marine, Inc. and the United States (E.D.La., CA No. 66–222, Division "B").

within 100 miles of court and at the time of taking Peaden's testimony Plaintiffs were in possession of a previous statement made by Peaden which was not made available to opposing counsel. Since Morgan apparently lived more than 100 miles from New Orleans and the deposition was properly noticed, there is no question about the admissibility of his deposition. I have compared Peaden's previous statement (which is in evidence and marked Plaintiff 13) with the testimony given in his deposition, and I cannot conclude therefrom that Defendants were thereby prejudiced in their cross-examination. Further, in any event, all counsel were present at Peaden's deposition and had ample opportunity to cross-examine. Each deposition was therefore admitted, read and given whatever weight the court thought they deserved, considering all the circumstances.

No credible evidence was presented to support the claim that the Miss Lou was negligent in any way.

On August 3, 1964, the United States Engineers wired Lambert:

"In reply refer to LMNKN-M-65-12. This office informed that M/V MISS LOU struck your sunken barge OR-420 in Morgan City-Port Allen route of Gulf Intracoastal Waterway on 2 August 1964, and sustained extensive damage. Have not received reply to telegrams from this office dated 18 May and 15 June 1964, requesting information regarding your intentions as to disposition of sunken barge and advising you of your responsibility to mark for day and night navigation. You are requested to take immediate action to mark the barge and advise this office when you expect to remove it from the waterway.

Jernigan, U. S. Army
Engineer District"

On August 4, 1964, Sam Buckley, an attorney in the United States Engineers District Counsel's office, talked with Lambert on the phone and confirmed by a telegram of August 5, 1964:

"In reply refer to LMNVL 65-2. This will confirm telephone conversation of 4 August 1964 between Sam Buckley of this office and Paul Lambert, wherein you advised that it was necessary to mark and light sunken barge OR-420 for day and night navigation continuously until barge is removed beginning this day and you agreed to mark and light today. This will further confirm suggestion that the Coast Guard will mark and light for your account upon request, but you must do the job until the Coast Guard has time to take it over. This office will check barge in the late afternoon of 4 August or early morning of 5 August and if not marked and lighted will prefer charges under 33 USCA 409, 411 through the U. S. Attorney's office and contact the Coast Guard to mark and light barge for your account.

Pecoraro, U. S. Army
Engineer District"

On August 11, 1964, the Engineers wired Lambert:

"Reports received 11 UXX August 1964 show your barge OR-420 unlighted and improperly marked with a drum on the bank side of the sunken barge. You have been warned before that you are required by law to keep your sunken barge properly marked and lighted. This is a serious matter involving the safety of persons and property and you are again warned that the Government will insist upon your immediate compliance with the marking and lighting requirements of the law and will take such steps as may be necessary to enforce such compliance.

Pecoraro U. S. Army
Engineer District"

Lambert finally hired a local Belle River man to mark and light the buoys. These were in place on August 19, 1964, and are shown in the photographs taken by Reeves. The large buoy is a big oil can in a rubber inner tube with a frame from which a lantern could be suspended. Lambert contends that this buoying was

the result of the Engineers' duress by way of penalties.

By August 14, 1964, Lambert had employed admiralty counsel and dispatched a reply to the United States Engineers, reading as follows:

"In reply to your reference LMNVL-65-4, this will advise that on May 22, 1964 Lambert Marine Inc. abandoned Barge OR-420 and has exercised no priorities in Barge OR-420 since that date. On Aug. 5, 1964 in response to reference LMNVL-65-2, Lambert Marine, Inc. placed certain markings on Barge OR-420 under threat of criminal penalties by US Army Engineers. Lambert Marine Inc. now reaffirms its prior abandonment of Barge OR-420 and hereby gives formal notice that it will not undertake the marking of the abandoned wreck.

Lambert Marine Inc.
Paul A. Lambert Pres."

This provoked the following reply of August 14, 1964:

"In reply refer to LMNVL 65-5. This will acknowledge your telegram received 14 August 1964 giving notice of abandonment of Barge OR-420. This District did not receive any notice of abandonment on 22 May 1964 or at any time prior to your telegram of 14 August. Acceptance of responsibility for marking and lighting and for removal of wreck is discretionary with Government and Government will not assume this responsibility for Barge OR-420 at this time. The Coast Guard will be contacted to mark and light for your account and you will be billed for the cost. You are to mark and light until Coast Guard takes over the job.

Pecoraro, U. S. Army
Engineer District"

In turn, Lambert rejoined on August 17:

"In reply your reference LMNVL-65-5 there is no question but United States Engineers now have notice of abandonment of Barge OR-420 by Lambert Marine Inc. Lambert Marine Inc. will not undertake marking the abandoned barge and will not accept responsibility for any charges in connection with marking the barge. If United States Engineers employ United States Coast Guard to mark the sunken barge it will be for the account of the United States Engineers.

Lambert Marine Inc.
Paul A. Lambert President"

Thereafter on August 17 the District Engineer requested the Commander, Eighth Coast Guard District to mark the barge "with lighted buoys as soon as practicable, for account of Mr. Paul Lambert, Lambert Marine, Inc., P. O. Box 188, St. Francisville, Louisiana. Payment for this service will be guaranteed by this office."

On August 21, 1964, the Coast Guard buoyed the wreck with a green lighted buoy and in the next mimeographed Notice to Mariners, that of August 24, 1964, described it as "Buoy maintained for Lambert Marine Inc., St. Francisville, La." They billed Lambert, who consistently refused to pay.

From August 17, 1964, up through the trial, the several Defendants have retained their legal position and have in no way waived or changed their positions. The final breaking up or removal of the barge was done by the United States Engineers under notice of November 18, 1966 to Lambert and Resolute and Lloyds that "the Government will remove the said barge at your cost and expense."

The subject matter of this suit falls within the admiralty and maritime jurisdiction of the Court and venue is properly laid in the Eastern District of Louisiana. The United States of America is properly sued under the Suits in Admiralty Act, 46 U.S.C. § 741 et seq.

The M/V Miss Lou was properly and lawfully navigated by competent personnel on the navigable water of the United States. The vessel being an uninspected inland, diesel towboat, her master and pilot need not be licensed by the

United States Coast Guard.[5] The proximate cause of the casualty was the failure to light and mark the wreck, or to remove it from the waterway expeditiously.[6]

The master of the Miss Lou had a right to assume that the waterway was clear of wrecks or that markers were present as required by law.[7]

The Barge OR-420 was wrecked and sunk in a "navigable channel" within the meaning of the Wreck Act, supra.[8] A vessel is entitled to the full reach of a navigable stream available to the line of high water, including muds along the shore.[9] The wreck owner is presumptively at fault when in violation of the provisions of the Wreck Act pertaining to lighting and removal of wrecks.[10]

Since Lambert failed to remove his sunken barge within thirty days after its sinking on May 17, 1964, the barge is presumed to have been abandoned to the United States by operation of law, and should have been removed or marked properly at the discretion of the Government.[11] Abandonment by operation of law having been established, the Secretary of the Army (Corps of Engineers) had the alternative either of disposing of the wreck or of marking it properly. He cannot ignore it; he must do one or the other.[12] Abandonment of

the wreck should have been assumed by the United States thirty days after the sinking of the OR-420, or by June 17, 1964, forty-six days prior to the Miss Lou stranding, ample time within which to have exercised its option to remove or to light or mark properly. The Government did neither, and in fact, did not even warn mariners prior to the Miss Lou sinking. The owner of a wrecked ship has the initial duty of removing or marking a wrecked ship. After it is abandoned, this duty clearly rests on the United States.[13] The question of Lambert's liability presents a more difficult problem. There is no doubt that Lambert, in fact, had abandoned its barge and had exercised no proprietary interest in the barge since May 22, 1964. Furthermore Lambert had statutorily "abandoned" the wreck when he failed to take any action to either remove or mark the wreck for thirty days following the sinking. But did this "abandonment" relieve Lambert of any further liability, or did it merely join the Government with Lambert as a joint obligor to remove or mark? Earlier cases held that an owner who did not intend to raise the wreck, but to abandon it, after notice, would not be responsible for damages caused by other vessels running into such wreck,[14] nor to anyone for the cost of raising it. A

5. 46 U.S.C. § 672(a); 66 C.F.R. § 157 et seq.

6. 33 U.S.C. §§ 409, 414; 14 U.S.C. § 86; 33 C.F.R. §§ 62.25–1, 62.25–5 (note 14); § 62.25–40.

7. Morania Barge No. 140, Inc. v. M & J Tracy, Inc., et al., 312 F.2d 78, 81 (2nd Cir. 1962).

8. Reading Co. v. Pope & Talbot, Inc., 192 F.Supp. 663, aff'd 295 F.2d 40 (3rd Cir. 1961).

9. Fulmer v. Williams, 122 Pa. 191, 15 A. 726, 1 L.R.A. 603; American Dredging Co. v. Calmer Steamship Corp., 121 F. Supp. 255, aff'd 218 F.2d. 823 (3rd Cir. 1955).

10. Morania Barge No. 140, Inc. v. M & J Tracy, Inc., et al., supra; Reading Co. v. Pope & Talbot, Inc., supra.

11. 33 U.S.C. § 414. Buffalo Bayou Transportation Co. et al. v. U. S., 375 F.2d 675 (5th Cir. 1967); Orrell v. Wilmington Iron Works, 89 F.Supp. 418 modified on other grounds, 185 F.2d 181, (4th Cir. 1950).

12. Buffalo Bayou Transportation Co., supra; Cornell Steamboat Co. v. United States, 138 F.Supp. 16 (S.D.N.Y.1956); Somerset Seafood Co. v. United States, 193 F.2d 631 (4th Cir. 1951).

13. Somerset Seafood Co. v. United States, supra.

14. The Manhattan, 10 F.Supp. 45 (E.D. Pa.1935); Highlands Nav. Corp. (The Nassau-The Grand Republic), 29 F.2d 37 (2nd Cir. 1928).

deliberate sinking made a difference.[15] The theory was that the owner had suffered sufficient loss in the loss of the craft and no further loss should be imposed upon him by way of damages for subsequent accidents, provided always that he had abandoned it. An owner's right to abandon and absolve itself of all further liability which may arise, was recently affirmed by the United States Court of Appeals, Fourth Circuit.[16] The Court held that the only legal consequence of an owner's failure to remove a sunken vessel, if it was not willfully created, was to give the United States the right to treat it as abandoned, remove it and retain salvage, and the Wreck Act made no distinction between careless and innocent sinkings. A negligent sinking by the owner did not deprive him of a right to abandon and, further, if he did abandon, the United States could not recover from the owner the cost of salvage. The United States Circuit Court of Appeals, Fifth Circuit, has partially disagreed.[17] *Cargill* stands for the proposition that only an innocent owner may abandon a sunken ship and avoid the obligation of either raising it or paying for its removal. If a negligent owner may not abandon and absolve himself from liability for cost of removal, would it not follow that he should not be permitted by the same token to escape liability to a third party whose vessel is damaged by the wreck? I interpret *Cargill* then to mean that if Lambert negligently caused the obstruction then he may not "abandon" and escape liability. If we follow *Cargill*, the Government and a negligent Lambert would be jointly liable for damages to Plaintiff, and the United States would be able to recover over from Lambert the cost of removal of the wreck. Since I have found as a fact that Lambert was not negligent in the sinking of its barge, and that Lambert had "abandoned" the barge, then he cannot be liable to plaintiff for its damages. The cases appear to make no distinction between an official, written "abandonment" and one which becomes effective by inactivity and passage of time.[18]

The United States has impleaded Underwriters alleging alternatively that Underwriters were liable under the Louisiana Direct Action Statute, LSA-R.S. 22:655, as amended, or that Underwriters had accepted abandonment of the barge and thus were the owners of the barge at the time of the alleged Miss Lou collision.

■■■ It is clear by its terms that the Louisiana Direct Action Statute, LSA-R.S. 22:655, as amended, is not applicable, as the policy of insurance in question expired on its face on June 1, 1964, more than sixty days prior to the alleged Miss Lou collision.

■■■ There was no evidence to support the contention that Underwriters accepted abandonment of the barge. The law is well settled that underwriters are entitled to accept a tender of abandonment and if the abandonment is accepted, it acts to transfer title to the property to underwriters.[19] The law is equally well settled that underwriters may decline to accept abandonment *and if the abandonment is not accepted, title to the property does not pass to* underwriters.[20] The evidence is clear that Underwriters did not accept aban-

---

15. United States v. Hall (1st Cir. 1894), 63 F. 472, held that a ship intentionally scuttled by its owner created an obstruction which the owner could be compelled to move at its expense.

16. United States v. Moran Towing & Transportation Co., supra. To the same effect, United States v. Bethlehem Steel Corp., supra; United States v. Zubik, 295 F.2d 53 (3rd Cir. 1961).

17. United States v. Cargill, Inc., supra.

18. 33 U.S.C. § 409.

19. Peele v. Merchants Insurance Co., 19 Fed.Cas., No. 10905, pp. 98, 118 (C.C.D. Mass., 1822).

20. The Tashmoo, 1937 A.M.C. 1536 (Arb., 1937); Arnould on Marine Insurance, (15th Ed) Section 1305; The Marine Insurance Act, 1906 Section 63(1), 6 Edw. 7.

donment of the OR-420 and, in fact, they indicated that they had no interest in the barge.

The United States further contends Underwriters had accepted abandonment of the barge by inference or through their action in attempting to salvage the barge.[21] No evidence was adduced to support this assertion. On the contrary, the evidence is uncontradicted that Underwriters made no efforts to salvage the barge and, in fact, had no further contact with the barge after Stanley visited the area a few days after the casualty. Inasmuch as there is no evidence to support the United States' assertion that Underwriters accepted the abandonment, the Petition of Impleader and the libel, insofar as it pertains to Underwriters, must be dismissed.

Plaintiff is entitled to full recovery for the loss and damage sustained by its Towboat, Miss Lou, from the United States. Let an interlocutory decree be entered accordingly.

---

21. Suart and SS Allegheny of London v. The Merchant's Marine Insurance Co., 14 Law Times Reports 564 (ABD 1898); The Tarv, Scots Law Times 745 (O.H.) (1924); Alliance Insurance Co. of Philadelphia v. Producer's Cotton Oil Co., 108 Miss. 589, 67 So. 58 (1918).