**GENERAL PUBLIC WAREHOUSE COMPANY, Inc.,**

v.

**QUEEN LINE, LTD., Cadogan Steamship Company, Ltd., Lomand Shipping Company, Ltd., and THE S.S. SCOTIA (formerly known as THE S.S. QUEEN MAUD), her engines, boilers, tackle & equipment, etc.**

No. 407 of 1956.

United States District Court
E. D. Pennsylvania.

Oct. 15, 1959.

George E. Beechwood, Philadelphia, Pa., for libellant.

Harrison G. Kildare, Philadelphia, Pa., for respondents.

VAN DUSEN, District Judge.

### Findings of Fact

The trial judge makes the following findings of fact:

1. At all times relevant to this action, libellant General Public Warehouse, Inc., was a corporation existing under and by virtue of the laws of the Commonwealth of Pennsylvania.

2. At all times relevant to this action, respondents Queen Line, Ltd., Cadogan Steamship Company, Ltd., and Lomand Shipping Company, Ltd. (allegedly no longer in existence), were all of 50 Wellington Street, Glasgow, Scotland, and were the owners and operators of the

S. S. Queen Maud (later sold to Nueva Valencia Compania Naviera, S. A., claimant herein), which is now known as the S. S. Scotia.

3. At all times relevant to this action, the respondent S. S. Scotia (formerly the S. S. Queen Maud), her engines, boilers, tackle and equipment, were within the Eastern District of Pennsylvania and within the jurisdiction of this court.

4. The S. S. Queen Maud was a merchant vessel of the British Empire class, similar to American Liberty ships, of 7,000 gross tonnage, and with an overall length of 432.2 feet, beam of 56.3 feet, and depth of 34.2 feet. Between the No. 3 and No. 4 hatches, the engine room casing projected 8 feet above deck level for a distance of about 35 feet. Her house amidships extended 24 feet above the deck. During its stay in Philadelphia in October 1954, it had a crew of 36.

5. From October 11 to October 15, 1954, the Queen Maud had been discharging her cargo at Pier 14, Port Richmond, Philadelphia. On the morning of October 15, she was shifted downriver to the north side of Pier 76 for engine repairs and was secured to Pier 76 at 8:20 A. M.

6. At all times relevant to this action, libellant General Public Warehouse Company, Inc., was lessee of Piers 76 and 77[1] from the United States Government.

7. Pier 76 extends outward from the west side of the Delaware River, running in approximately a southeast-northwest direction. It is an open dock, without sheds or other structures, approximately 540 feet long, 45 feet wide, and about 5 feet above the water, with a graving dock for drydocking purposes located on the south side but not extending as far out into the river as the pier itself.

Pier 76 was equipped with bollards on each side, evenly spread along the pier edge. These bollards were approximately 3 to 4 feet high, solidly bolted into the concrete pier foundation, and were set back on a line about 5 feet from the pier edge. There were 9 bollards on the north side of the pier and seven bollards and two cleats, similarly bolted, on the south side of the pier. Along the middle of the pier, from the shore to the outer end, were tracks for the movement of a gantry crane, which, when not in use, was kept on shore, where it was located at the time of the accident involved in this case.

Pier 77 is to the north of, and runs parallel to, Pier 76. The south side of Pier 77 is nearly 200 feet north of the north side of Pier 76. A knuckle protrudes from the south side of Pier 77 but does not extend as far out into the river as the end of the pier itself (see Exhibit L–2A).

8. On the morning of October 15, 1954, the Queen Maud was berthed on the north side of Pier 76, with her bow toward the shore. Her draft at this time was 9 feet forward and 12 feet, 6 inches, aft. The depth of the water on the north side of Pier 76 varied between 12, 14 and 16 feet.

9. When it was berthed on the north side of Pier 76 in the morning of October 15, 1954, the Queen Maud was moored in the following manner: from the starboard quarter of the bow, by one 8-inch manilla rope; from the port quarter of the bow, by two 8-inch manilla ropes; from the port after end of the forecastle head, by one 8-inch manilla rope bight (one rope, coming from and attached to the ship, passing around the bollard) leading forward and attached to the same bollard as the lines from the port quarter of the bow, and by one 3¼-inch wire spring rope leading aft; from the port side toward the stern of the vessel, by one 3¼-inch wire spring rope leading forward; and at the stern of the vessel, attached to the same bollard, from the starboard outer quarter, by one 8-inch manilla rope, and from the port inboard quarter, by two 8-inch ma-

[1]. These piers are 76 North and 77 North, being west of the southern tip of Petty Island. See Exhibit L–2A.

nilla ropes. The dimensions of the ropes refer to circumference. Only those bollards on the north side of Pier 76 were used (see Exhibit B of Document No. 15).

10. During the day of October 15, 1954, the master of the Queen Maud, James Adam, received over the radio every half hour warnings which gave the location, direction and intensity of the storm known as "Hurricane Hazel." Reports of this hurricane were received by the United States Weather Bureau station at Philadelphia at the latest by the late afternoon of the preceding day. At 1 P. M., October 15, 1954, the Chief Officer of the Queen Maud, Duncan Finlayson, received a warning from the Harbor Authorities that the hurricane was to pass about 70 miles west of Philadelphia at approximately 9 P. M. that evening.

11. Shortly after 1 P. M., October 15, 1954, the master ordered additional lines put out to secure the ship. From this time up to the time of the accident, the moorings were as follows: from the starboard quarter of the bow, one 8-inch manilla rope bight; from the port quarter of the bow, one 8-inch manilla rope bight, one 3¼-inch steel wire spring rope, and one 5-inch insurance wire; from the port after end of the forecastle head, one 8-inch manilla rope bight leading forward and one 3¼-inch wire spring rope bight leading aft; from the port side toward the stern one 3¼-inch wire spring rope and one 8-inch manilla rope, both leading forward; at the stern, from the starboard outer quarter, one 8-inch manilla rope bight and from the port inboard quarter, one 8-inch manilla rope bight, one 8-inch manilla rope, and one 5-inch insurance wire. The same bollards were used as those used in the morning of October 15, 1954 (see paragraph 9 above).[2]

12. Rain fell intermittently throughout the day, totalling 0.43 inches. The wind force increased rapidly after 12 noon with the approach of the storm center. Its direction throughout the afternoon was approximately from the southeast, bearing almost directly on the stern of the Queen Maud. At about 7:30 P. M., the wind shifted to a southerly direction, bearing directly upon the port side of the stern of the vessel, and at approximately a 45-degree angle upon its port side. At 7:44 P. M., the velocity of the wind was measured over a 5-minute period at 65 m.p.h. The fastest single mile recorded at the Custom House was 73 m.p.h. at 7:45 P. M. Gusts of 94 m.p.h. were recorded at International Airport between 7:36 P. M. and 7:41 P. M. The river rose to about the level of the dock.

13. The area of the Queen Maud exposed to the winds totalled approximately 11,430 square feet. Hurricane winds of 90 m.p.h. exert a pressure of 30 pounds per square foot.

14. At 8:10 P. M., the stern lines of the Queen Maud parted. The stern of the vessel swung northward away from Pier 76 under the force of the hurricane, until the starboard quarter of the stern struck the south side of Pier 77 with considerable violence. The bow of the vessel then moved forward, striking the bulkhead between Piers 76 and 77. The stern of the vessel swayed back and forth and continued to strike Pier 77. At this time, there were 10 or 12 members of the crew on board the Queen Maud.

15. At 8:20 P. M., libellant's security guards on duty at the pier were notified at their office near the docks that the Queen Maud had broken loose from her moorings. The guard captain, Fred Fay, and three other guards made their way to Pier 77. They obtained a rope from the pier similar to those used to secure the Queen Maud. At this time, three crewmen from the Queen Maud came to Pier 77, but, though requested by the guards, they offered no assistance. The guards finally got the rope onto an available bollard on Pier 77. After about a half-hour of hollering by

2. See Exhibit C of Document 15 and Answer of Adam to Interrogatory 11, page 4, of Document 15.

the guards to those on board ship, a crew member looked over the side and, after some argument, threw a line to the guards, who tied it to the rope. The rope was pulled to the ship and the ship was made secure to Pier 77. The guards obtained another line from the pier and, putting it on another bollard, used it to secure the vessel in the same way, thus preventing further damage to the pier.

16. The velocity of the wind diminished steadily after 9 P. M.

All requests for findings of fact inconsistent with the foregoing are denied.[3]

## Discussion

Libellant has brought this action to recover for the damage to its pier. By agreement of counsel, the only issue to be determined here is that of liability.

■ It is well settled that when a collision is caused by a vessel drifting from her moorings, there is a presumption of fault on her part and she is liable unless she can produce evidence to show that the drifting was a result of an inevitable accident which human skill and precaution and a proper display of nautical skill could not have prevented. The Louisiana, 1865, 3 Wall. 164, 70 U. S. 164, 18 L.Ed. 85; Swenson v. The Argonaut, 3 Cir., 1953, 204 F.2d 636; The Chickie, 3 Cir., 1944, 141 F.2d 80; Patapsco Scrap Corp. v. Maryland Shipbuilding & Drydock Co., 4 Cir., 1959, 268 F.2d 817, affirming D.C.Md.1959, 169 F.Supp. 605; United States v. South Carolina State Highway Dept., 4 Cir., 1948, 171 F.2d 893; The President Madison, 9 Cir., 1937, 91 F.2d 835; The Havana, 2 Cir., 1937, 89 F.2d 23. As stated by Judge Kalodner in Swenson v.

The Argonaut, supra, 204 F.2d at page 640:

"It is well-settled that the burden of proving inevitable accident is 'heavily' upon the party asserting that defense; that a finding of inevitable accident is 'not to be lightly arrived at'; that the respondent must affirmatively establish that the accident ' * * * could not have been prevented by the use of that degree of reasonable care and attention which the situation demanded', and that there was no intervening act of negligence on its part; when a collision is caused by a vessel drifting from her moorings there is a presumption of fault on her part and 'she must be liable * * * unless she can show affirmatively that the drifting was the result of inevitable accident, * * * which human skill and precaution and a proper display of nautical skill could not have prevented.' "[4]

■ Respondents have not sustained their burden of exonerating themselves from liability for the accident involved here. All the experts, including respondents' expert, Captain Quistgaard, agreed that the proper mooring of the Queen Maud to Pier 76 under the conditions that existed on October 15, 1954, required utilizing the bollards on the south side of the pier, either solely or in addition to those used on the north side of the pier (N. T. 118–9, 142, 316, 420, 439). Such bollards were available (N. T. 200, 266, Exhibit L-12) and, on this particular day, there were no obstructions to prevent the running of lines across the pier to them (N. T. 200). The purpose in mooring this vessel in such a manner

---

3. Libellant concedes that respondent's Requests for Findings of Facts 1 to 6 are accurate. See page 8 of Document No. 21.

4. Although the rule may be stated differently by others (cf. Cranberry Creek Coal Co. v. Red Star Towing & Transp. Co., 2 Cir., 1929, 33 F.2d 272, 274, certiorari denied 1929, New York Marine

Co. v. Cranberry Creek Coal Co., 280 U.S. 596, 50 S.Ct. 67, 74 L.Ed. 643; The Cullen No. 32, 2 Cir., 1932, 62 F.2d 68, 70; Griffin on Collision (1949), §§ 24 & 25), this court is bound by the decisions of the United States Court of Appeals for the Third Circuit. Cf. Virgin Islands Corp. v. Merwin Lighterage Co., 3 Cir., 1958, 251 F.2d 872, 873–4.

would be to have the lines running as horizontal as possible from dock to ship. This would provide protection not only against the lines slipping off the bollards with the expected rise of water, but also against the lines snapping with the roll of the ship. A more vertical line, because it would not have the slack of the horizontal line, would tend to snap more readily with a roll of the ship away from it. Furthermore, the use of more bollards would ensure against the wire ropes binding against the manilla ropes to cause them to part. All the lines from the stern of the ship should not have been placed on the one bollard at the end of the dock (N. T. 123, 348, 440). Though Captain Quistgaard later changed his opinion about extending the lines across the pier, his principal objection being that the horn on the bollards on the south side faced the center of the pier and, therefore, would not prevent the line from slipping off (N. T. 459–460), he freely admitted that, by running the rope around the bollard under the horn, it would be prevented from slipping off (N. T. 478–9). To further support his change of opinion, Captain Quistgaard testified that, with lines to the bollards on both sides of the pier, the differences in length of the lines would make it difficult, if not impossible, to equalize the tension upon them and that, therefore, there would be less strength than under the arrangement ordered by Master Adam (N. T. 464–5). It would appear from this testimony, however, that the Captain was assuming that the regular manilla rope would be attached to the bollards across the pier. It nowhere appears that it would not be feasible to arrange the lines so as to equalize the tension upon them by placing the wire rope, which is not so elastic as the manilla rope, on the bollards across the pier, while placing the manilla rope on the bollards close to the ship. Also, adjustment of the ropes could be made if necessary. It is to be noted that the Captain gave his first opinion as to the propriety of using the bollards across the pier with particular reference to insurance wires (N. T. 118–9, 142). Such arrangement would also, as mentioned above, prevent the wire rope from binding against the manilla rope.

It is concluded, therefore, that the failure of Master Adam to use the bollards on the south side of the pier constituted a lack of nautical skill and precaution. It has not been shown that mooring the Queen Maud by using these additional bollards would not have prevented this accident. The wind was not so severe as to cause the lines in use to part. Captain Quistgaard testified that it would require a sustained wind or gust of 175 m. p. h. to part the lines in use (N. T. 160). The gusts recorded on this day, as far as this record shows, were nowhere near this velocity. Some other factor, such as improper mooring with the lines used, would, therefore, have caused the accident.

In addition to the foregoing, experts for both the parties testified that, if the storm warnings so warranted it, the entire crew should have been required to remain on the ship (N. T. 90, 321). At the time of this accident, there were only ten or twelve men on board. However, in shifting from one pier to another, as the Queen Maud did in the morning of October 15, 1954, the entire crew should have been required to have been on board (N. T. 87–8). Therefore, some time after the Queen Maud berthed at Pier 76, Master Adam permitted most of the crew to go ashore. This was improper. Hurricane warnings had been issued at least by late afternoon of October 14, 1954 (Exhibit L-2). The record shows that Master Adam himself had heard warnings every half hour throughout the day of October 15, 1959 (Exhibit L-1). Therefore, Master Adam knew, or should have known, see The President Madison, supra, 91 F.2d at page 841, of the hurricane warnings before he permitted the crew to leave the ship. Furthermore, these warnings did not justify dismissal of the crew. The severity of the storm was adequately depicted. Master Adam, who presumably had knowl-

edge of the erratic nature of hurricanes, would certainly not have been entitled to rely on the prediction that the storm center would pass 70 miles west of Philadelphia. The necessity for a full crew during this storm was well exemplified by the testimony of Fred Fay, the captain of the pier security guards, who was instrumental in securing the Queen Maud to Pier 77 and preventing further damage to it. He related how difficult it was to get the attention of anyone on board to throw him a line (N. T. 227, 241). Although this incident relates essentially to respondents' liability for failure to take proper precaution after the ship broke loose, it shows the danger of undermanning a vessel during such conditions as existed at this time. To prevent breaking from its moorings during the storm, a full crew may well have been required to stand by the ropes to adjust them, when necessary, to equalize the tension upon them.[5]

Other suggested items of negligence, such as failure to sink the ship at the pier or failure to go out to sea, need not be considered.[6]

### Conclusions of Law

1. The court has jurisdiction of the parties and of the subject matter.

2. Respondents have the burden of coming forward with evidence to show that the damage to libellant's pier, caused by the drifting of the Queen Maud from its mooring, was the result of an inevitable accident which a proper display of nautical skill could not have prevented.

3. Respondents have failed to produce evidence to show that the damage to libellant's pier, caused by their ship drifting from its moorings, was the result of an inevitable accident which a proper display of nautical skill could not have prevented.

4. James Adam, Master of the Queen Maud, and agent of respondents, failed to display that nautical skill required under the conditions that confronted him on October 15, 1954, in that (1) he failed (a) to utilize the bollards on the south side of Pier 76, using at least some additional mooring lines for this purpose, or, at the least, (b) to use breast lines; and (2) he failed to retain aboard the full complement of crew, though he had knowledge of the approach of the hurricane.

5. On this record, the above legal conclusions follow whether the burden of proof, as opposed to the burden of going forward with the evidence, rests upon libellant or respondents.

6. Respondents are liable for the damage to libellant's pier and bulkhead.

All requests for conclusions of law which are inconsistent with the foregoing are denied.

Libellant may submit an order in accordance with the foregoing, stating that the issue of liability has been decided in its favor, if it so desires. Counsel shall notify the undersigned if they are unable to agree upon the issue of damages within three months.

---

5. In one other aspect it may be that Master Adam did not display that nautical skill required under the conditions confronting him. This was in failing to relocate his ship. The extent of exposure of the Queen Maud at Pier 76 must have been quite obvious to Master Adam when he berthed there (N. T. 122). And, as mentioned above, he would have had knowledge at this time of the severity of the approaching storm. It has not been shown by respondents that the Queen Maud had to dock at Pier 76 or that to move the ship from that pier to a more protected location would have been impracticable or impossible. Of course, such a move would have required a full crew.

6. The entries in the logbook (Exhibit A of Document No. 15) are admissible in evidence. See 28 U.S.C.A. § 1732; Lopoczyk v. Chester A. Poling, Inc., 2 Cir., 1945, 152 F.2d 457, 460, footnote 4; Naylor v. Isthmian S. S. Co., 2 Cir., 1951, 187 F.2d 538.