Richard SEELEY, Plaintiff,

v.

**RED STAR TOWING AND TRANSPOR-
TATION COMPANY, Defendant and
Third Party Plaintiff,**

v.

**PENN INDUSTRIES, INC., Third
Party Defendant.**

No. 73 Civ. 3884.

United States District Court,
S. D. New York.

June 5, 1975.

McHugh, Heckman, Smith & Leonard, New York City, for defendant and third party plaintiff; Richard E. Meyer, New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for third party defendant; Joseph C. Smith, New York City, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

This suit arises out of a collision that occurred on Thanksgiving evening, November 23, 1972, between the scow COEN 40, which was in tow of the tug HUNTINGTON, and a sunken stakeboat.

In September 1973 the original plaintiff, Richard Seeley, chief engineer aboard the HUNTINGTON, instituted an action, pursuant to 46 U.S.C. § 688, against that vessel's owners and operators, Red Star Towing and Transportation Co. ("Red Star")[1] to recover damages for personal injuries sustained in the collision. In November 1973 Red Star impleaded third party defendant Penn Industries, Inc. ("Penn")[2] which owned and operated the stakeboat, seeking to recover full indemnity or contribution for amy amount it might have to pay Seeley. In addition, Red Star's third party complaint asserted a direct claim against Penn for damages to the hull of the HUNTINGTON resulting from the collision.

The action brought by Seeley was settled and discontinued prior to this trial. Red Star and Penn stipulated that the amount of the settlement paid Seeley ($10,000) was reasonable. (Tr. 6)[3]

The instant claim was tried to the Court on January 30, 1975 only to determine liability between Red Star and Penn with respect to Seeley's personal injuries and damage to the HUNTINGTON. For the reasons that follow, we find Penn liable for the collision and the negligence of the HUNTINGTON's captain a contributing factor. Accordingly, we hold that Red Star is entitled to contribution for the amount paid Seeley and to damages sustained by the HUNTINGTON.

### I

### THE PENN STAKEBOAT

Penn owned and operated a stakeboat located in General Anchorage 11 off Rikers Island, East River, New York in 1971. (Tr. 6–7, 67)[4] The stakeboat was a steel hull approximately 120 feet in length with a beam of 26 feet. The only superstructure the hull contained was a house on the deck approximately six feet in height. (Tr. 15, 58) Red Star also maintained a stake (the "Red Star buoy")[5] about 375 to 400 yards west of the stakeboat. (Tr. 14, 15; Exh. A) The stakeboat and the Red Star buoy were used by tugs for "hanging up" tows for a distribution point or to stand by and wait for tide. (Tr. 15)

On December 17, 1971 Penn discovered that its stakeboat had sunk at its mooring.[6] Penn's marine superintendent notified the United States Coast Guard and Army Corps of Engineers.

---

1. At all material times Red Star, a West Virginia corporation having its principal place of business in New York, owned the HUNTINGTON.

2. At all material times Penn was a New York corporation.

3. The notation, "Tr." refers to the official trial transcript.

4. The precise location of the stakeboat was 40°–47 minutes–40 seconds north latitude and 73°–52 minutes–13 seconds west longitude. (Tr. 67; Exh. 5)

5. Red Star's buoy was approximately 50 feet in diameter, with a shackle in the middle and cables on it on which to hook up barges. (Tr. 14–15)

6. The stakeboat remained sunk up to and including November 23, 1972. An unsuccessful attempt to raise it took place in the spring of 1973. In the fall of 1973 the stakeboat was raised by Penn in less than two weeks. (Tr. 82, 99–101)

The Coast Guard issued a Radio Notice to Mariners warning of the sunken stakeboat. (Tr. 68–69; Exh. 10)

Arrangements were made to have the sunken stakeboat marked with a white triangular day marker, placed on a steel stanchion welded to the side of the boat. The marker had an orange border, was marked with the words "Danger—Submerged Wreck" and had a quick-flashing light. (Exh. 10 at p. 6)

In late April 1972 Penn discovered that the marker was missing and replaced it with a more rigid, larger size, diamond shaped marker, painted with the same warnings as the first sign. A quick-flashing white light was fastened to the top of the sign. The sign was welded to a ten foot pipe which in turn was welded to the side of the sunken stakeboat. (Tr. 73, 83–85; Exh. 9) The top of the sign contained a battery-operated light which was activated by a light-sensitive photoelectric cell. When darkness set in, the bulb in the light was activated and at dawn it was shut off. (Tr. 78, 79–80; Exh. 8)

## II

### THE COLLISION

The HUNTINGTON arrived at 8:10 in the evening of November 23, 1972 to pick up the scow COEN 40 and take it to Eastchester, New York. (Tr. 16)[7] Before it could pick up the COEN 40, however, the HUNTINGTON had to "wait for tide" for one hour and forty-five minutes. (Tr. 16–17) At approximately 9:45 p. m. the HUNTINGTON resumed operations by maneuvering to the stern of the COEN 40 to secure it in "push boat" fashion for the shift to Eastchester. The COEN 40 was secured to another vessel ahead of it which in turn was secured to the Red Star buoy. (Tr. 18, 21)

As the HUNTINGTON maneuvered astern of the COEN 40, Capt. McClaren,

who was in the pilot house controlling the operation, assigned two deckhands on watch to the bow to handle the lines. (Tr. 18–19) After the deckhands secured lines from the bow of the HUNTINGTON to the stern of the COEN 40, the latter vessel was released from the vessel ahead of it. (Tr. 20) After the COEN 40 was released, the HUNTINGTON, while making way against the tide, began maneuvering from port to starboard, back and forth, to take up the slack in the lines. (Tr. 20–21) The two deckhands remained forward during this maneuver, pulling in the slack on the lines. It should be noted that during this maneuver the tide was running in an easterly direction. Because of the effect of the tide, the HUNTINGTON, which was facing westerly, and the COEN 40 were drifting east in direction of the sunken Penn stakeboat. (Tr. 21, 39)

The HUNTINGTON made approximately two swings in each direction. As the HUNTINGTON tightened the lines by this maneuver, Capt. McClaren kept looking out of the stern windows for the light marking the Penn stakeboat. Although visibility was good, Capt. Mc-Claren could not see the light. (Tr. 22, 24, 25) Nonetheless, he did not attempt to find the stakeboat light by use of the searchlights on the tug. (Tr. 29–31, 39–42)

About the time the deckhands finished taking up the slack in the lines, the starboard stern corner of the COEN 40 started to list and the load started to shift. Capt. McClaren then realized that the COEN 40 had contacted something, and because of the way the load shifted that the scow was taking water. He immediately ordered the deckhands to cut the lines to the COEN 40. (Tr. 23, 52) The deckhands started throwing the lines off but before the COEN 40 could be completely released, it capsized and in the process hit the bow of the

---

7. The HUNTINGTON was in command of Capt. McClaren, its regular commander. Crew members aboard the tug were assigned six hour "watches." Capt. McClaren, along with Chief Engineer Seeley and two deck-hands had the 6 a.m. to noon and 6 p.m. to midnight watches. The "off watch" crew were not involved in any relevant way here. (Tr. 10, 11, 19–20)

HUNTINGTON causing hull damage. (Tr. 25–26, 52–53)

Immediately after the COEN 40 capsized, the side lights of the HUNTINGTON revealed the diamond shaped sign marking the Penn stakeboat immediately alongside the tug. (Tr. 24–25)

## III

## DISCUSSION

We begin with an analysis of the relevant statute here, 33 U.S.C. § 409, which provides in pertinent part:

It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels . . . . And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently . . . . .

■■ At the outset it should be noted that although the statute speaks in terms of "navigable channel[s]" it is well settled that the navigable channel definition of Section 409 is not confined to deeper channels marked by buoys. *Red Star Towing & Transp. Co. v. Woodburn*, 18 F.2d 77, 78 (2d Cir. 1927); *Reading Co. v. Pope and Talbot, Inc.*, 192 F.Supp. 663 (E.D.Pa.1961). Accordingly, we hold that the requirements of Section 409 regarding sunken vessels in navigable channels apply here

with full force. See *United States v. Raven*, 500 F.2d 728, 732 (5th Cir. 1974); *Kaiser v. Traveler's Ins. Co.*, 359 F.Supp. 90 (E.D.La.1973), *aff'd*, 487 F.2d 1300 (5th Cir. 1974); *Jones Towing, Inc. v. United States*, 277 F.Supp. 839 (E.D.La.1967).

As we view it there are three issues raised by our facts: first, whether Penn violated Section 409 by permitting its sunken stakeboat to be unlit on the night in question; second, whether Penn violated the same section by failing to promptly remove the sunken stakeboat; third, was the alleged negligence of Capt. McClaren such a proximate, contributing cause as to reduce any recovery by Red Star.

■ As to the first question, Red Star adduced the only testimony. Its Capt. McClaren testified in convincing fashion that he was certain that the flashing light on top the sunken stakeboat was unlit on the night in question. (Tr. 24–25) On this key issue he was not controverted, although Penn did introduce unimpressive evidence to the effect that the flashing light was operative the day after the occurrence (Tr. 91) and that in general the flashing light was in good working order. (Tr. 81, 92, 103–04) We find that the light was inoperative on the night in question and hold accordingly that Penn violated Section 409 by its omission.

■ We also resolve the second issue, whether Penn failed promptly to remove the sunken stakeboat, in favor of Red Star. Under all the circumstances Penn did not effect the prompt removal of the sunken stakeboat, and accordingly violated Section 409. *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); *In re Chinese Maritime Trust, Ltd.*, 478 F.2d 1357 (2d Cir. 1973); *Kaiser v. Traveler's Ins. Co., supra.*[8]

■ The third question is whether any negligence on the part of Capt. McClaren contributed to the collision,

---

8. See note 6, *supra.* As indicated there, Penn waited more than two years to remove the stakeboat.

We are constrained to, and do, find Capt. McClaren negligent. He had been out at the sunken stakeboat on more than 200 missions. (Tr. 47) On each prior occasion the flashing light was lit. (Tr. 30) On this occasion the flashing light was not illuminated; nonetheless, Capt. McClaren chose not to employ the available searchlights to look for the sunken stakeboat. (Tr. 29–31, 39–42) In our estimation, this failure to exercise due care under all the facts and circumstances then existing constituted negligence, and was a proximate cause of the eventual collision. Accordingly, we reduce the judgment in Red Star's favor by 25%.

The amount of damage to the hull of the HUNTINGTON will be determined at a later date. For the present we hold that Red Star is entitled to contribution from Penn in the amount of $7,500 (the $10,000 Red Star paid Seeley in settlement less 25% thereof).

This opinion constitutes our findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52.

So ordered.