**UNITED STATES of America, Plaintiff,**

v.

**OSAGE COMPANY, INC., Defendant.**

**Civ. A. No. 75–942.**

United States District Court,
W. D. Pennsylvania.

June 11, 1976.

---

6. See supra note 1 for the two cases presently pending before the Fifth Circuit on this point.

Donald R. Kronenberger, Jr., Trial Attorney, Admiralty & Shipping Section, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Donald J. Lee, Pittsburgh, Pa., for defendant.

MARSH, District Judge.

## OPINION

In its complaint, the United States sues the defendant, Osage Company, Inc., (Osage) pursuant to 33 U.S.C. § 409 for $17,878.09 [1] being the net cost of removal of sunken Barge 417 belonging to Osage, and a penalty of not more than $2,500 nor less than $500 pursuant to 33 U.S.C. § 411.

This is an admiralty and maritime claim under Rule 9(h) Fed.R.Civ.P. The court has jurisdiction of the action under 28 U.S.C. § 1345.

After non-jury trial, it is my opinion that the evidence as to the alleged cost of removal of the barge was not shown to have been fair and reasonable, but was grossly

excessive. I find that the reasonable cost of removal amounted to $5,700. (Tr. 298).

I find that the civil penalty requested, absent indictment or information, is not warranted against Osage in this *in personam* action.[2]

The Monongahela River is a navigable waterway of the United States and is used extensively by commercial as well as recreational vessels. At Mile 16.3, where Barge 417 was sunk, the River is approximately 750 feet wide. The commercial channel is in the center.

Osage had leased Risher's Landing on the left bank of the Monongahela River from Consolidation Coal Company which lease apparently gave Osage the right to moor two barges to each other and to the willow trees on the land. These vessels were called spar barges and were used as a landing dock for other vessels to keep the latter off the bank and in deeper water. There was no guard or fence on the land to prevent access to the spar barges and the mooring trees.

The two barges were identified as Barge 126 and Barge 417, the latter being moored on the downstream end of Barge 126. The ends of the two barges were lashed together on the land side by a steel cable 7/8th inches thick tied around the timberheads and tightened with a ratchet; on the river side they were lashed together by a rope tied around the timberheads. Barge 126 was tied fore and aft to willow trees on the river bank by steel cables of the same size. Barge 417 was tied aft to a large tree. The barges and their lines were inspected each week by Osage's master mechanic, Lester E. Deily, during the summer of 1970 and 1971 until September 27, 1971, and the barges were inspected a couple of times in July, 1971 by John R. Ross, who came to Osage as vice-president in July, 1971.

Osage owned both barges. Barge 417 was an open steel barge 175 feet long, 26

---

1. The testimony shows an amended amount of $17,731.84. (Tr. 132).

2. See Rivers and Harbors Act, 33 U.S.C. §§ 411 and 412. No indictment or information against Osage has been filed under § 411; under § 412 the penalties listed are limited to masters, pilots and engineers and do not apply to owners; and only the vessel is liable to the penalties in an *in rem* proceeding.

feet wide and 11 feet deep. It was built in 1927. It had been replated in the late 1950's and the shell-plating was in good condition on the bottom, sides and knuckles. It contained 50 to 100 tons of mud, some coal, stone and silt. The interior of the hopper was not in good condition. As of September 27, 1971, Barge 417 was seaworthy for use as a spar barge. No mooring problems had occurred during the year and three months the two spar barges had been tied up at Risher's Landing, and the securing cables had never needed an adjustment. The barges had not been used for docking equipment by Osage since May or July, 1971. (See PX 3 and Tr. 216).

Sometime prior to the early morning of September 27, 1971, Barge 417 mysteriously left its mooring site and sank approximately 200 feet downstream of its original position. It lay diagonally on the river bottom with its downstream outboard corner approximately 150 feet from the left bank. In the morning of September 27th it was struck in its sunken position by M/V Three Rivers whose Captain reported the casualty to the Coast Guard.

Upon being advised of this casualty Vice-President Ross went to Risher's Landing, observed the sunken barge and engaged a diver, Vincent J. Hammill, to inspect it and to mark it with a 55-gallon drum market. Mr. Ross notified the Coast Guard and the Pittsburgh District Corps of Engineers of this action. The Engineers placed a buoy over the barge to warn river traffic of the danger.

On October 20, 1971, Osage sent a letter to the District Corps of Engineers, tendering abandonment of Barge 417. On November 1, 1971, the Corps acknowledged receipt of Osage's letter but refused to accept the tendered abandonment, and refused to waive any right to enforce liability for cost of removal. I find nothing in the Rivers and Harbors Act, 33 U.S.C. § 401, *et seq.*, which requires the plaintiff to accept an offer of abandonment.

Osage abandoned the barge for economic reasons in that the sunken barge was worth two, three or four thousand dollars and it would cost five or six thousand dollars to remove it. (Tr. 218).

Later the Engineers determined that the sunken barge constituted an obstruction to navigation; funds for the removal were requested and obtained. It took five days to remove the barge. (Tr. 67–70). The Engineers used their own equipment and personnel. The barge was cut up during removal and the remains were transported to Neville Island and subsequently sold for $1,360.14. The total cost alleged to have been incurred by the Engineers was $19,091.98, the net cost being $17,731.84 which is demanded of Osage. On July 22, 1974, the Engineers sent a bill to Osage for the net cost in the amount of $17,878.09 (an inaccurate amount, see fn. 1), which Osage refused to pay.

The action was brought against Osage pursuant to 33 U.S.C. § 409 which provides in its pertinent part as follows:

"It shall not be lawful . . . to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; . . . . And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411 to 416, 418, and 502 of this title."

The plaintiff did not present any direct evidence that Osage "voluntarily or carelessly" caused its Barge 417 to sink. At the time, the river and its current were substantially normal. There was no evidence of any kind to establish that unusual water

conditions or other environmental factors contributed in any way to the breakaway. The defendant has failed to prove that the breakaway was caused by another ship's passing, unusual water conditions, inevitable accident or vandalism. None of the cables and rope securing Barge 417 were found on the barge or on Barge 126 or on the bank. Diver Hammill found no holes in the sides of the barge which extended above the mud in the river bottom.

There was no proof that any other barge or vessel in the vicinity of Risher's Landing broke loose on that day or on the days before or after.

The Engineers who cut up and removed the barge from the river to Neville Island detected no holes in the replated sides or bottom of the barge.

Vice-President Ross and diver Hammill were of the opinion that the breakaway was caused by vandals or by collision with a vessel trespassing on Risher's Landing. (Tr. 199, 230, 284–285). Obviously, there had to be a hole in the barge below the water line in order for it to sink. Where the hole was and how it got there is unknown. If I were to speculate, I would find an interloping vessel struck the barge at the landing, opened a hole and broke the cables which were lost in the river as the barge drifted for about 200 feet and sank. However, the defendant failed to present any evidence to prove that the barge left the landing by accident or by innocent misfortune. In these circumstances, as I understand the law, the defendant is presumed to have been the negligent cause of the breakaway and sinking of its barge.

"It is now well-established that where a vessel sinks in a navigable waterway due to the negligence of its owner, so that it creates an obstruction to navigation, the owner may not shift the burden and expense of removing the obstruction to the

United States by abandoning the vessel. Rather, under § 409 of the Wreck Act, the owner is required either to remove the sunken vessel, or to reimburse the government for the cost of removal. *Wyandotte Transportation Co. v. United States*, 389 U.S. 191 [88 S.Ct. 379, 19 L.Ed.2d 407] (1967)."

*United States v. Chesapeake & Delaware Shipyard, Inc.*, 369 F.Supp. 714, 720 (D.Md. 1974). Since *Wyandotte*, abandonment by the owner will no longer shield him from liability under the Act if the sinking is due to the owner's negligence. Only owners of ships which sink without fault still retain the right to abandon as an alternative to removal without paying the cost of removal. See *Lane v. United States*, 529 F.2d 175, 177 (4th Cir. 1975). The Court in *Wyandotte* concluded that the government could proceed *in personam* on a negligence theory to recover the cost of removal to enforce § 409 of the Act, which makes it unlawful to "voluntarily or carelessly sink" a vessel in navigable waters.

However, *Wyandotte* requires proof of negligence on the part of the owner in order to hold it liable for the cost of removal. 389 U.S. at 201, 88 S.Ct. 379. If it could be found that someone other than the owner caused the barge to drift from its mooring and sink, the owner would not be liable for those costs.[3] In this case the only proof of negligence on the part of Osage is supplied by presumption.

In *Zubik v. Zubik*, 384 F.2d 267 (3rd Cir. 1967), it was held that when a collision is caused by a vessel drifting from its moorings there is a presumption of fault on the part of the vessel's owner. In *Patapsco Scrap Corp. v. Maryland Shipbuild. & DryDock Co.*, 268 F.2d 817, 820 (4th Cir. 1959) it was stated "in this class of cases there is liability unless a presumption of negligence is satisfactorily rebutted." To the same effect is *General Public Warehouse Co. v.*

**3.** In *United States v. Raven*, 500 F.2d 728, 733 (5th Cir. 1974) it is stated: "Sweeping as are the obligations under the Rivers and Harbors Act, the duty to *pay* is confined to those who negligently caused the obstruction." See also, *In Re Boat Demand, Inc.*, 174 F.Supp. 668

(D.Mass.1959); *The Manhattan*, 10 F.Supp. 45, 49 (E.D.Pa.1935), *aff'd* 85 F.2d 427 (3rd Cir.), *cert. denied, sub nom., United States v. The Bessemer*, 300 U.S. 654, 57 S.Ct. 432, 81 L.Ed. 864 (1936).

*Queen Line, Ltd.*, 177 F.Supp. 916, 919 (E.D. Pa.1959).

In defense the owner has a heavy burden to prove affirmatively that the drifting and sinking of its barge was the result of *vis major*, or inevitable accident, or an interloping vessel, unusual water conditions, or vandalism. *The Louisiana*, 70 U.S. (3 Wall.) 164, 173, 18 L.Ed. 85 (1865); *Zubik v. Zubik, supra* at 269–270; *Patapsco Scrap Corp. v. Maryland Shipbuild. & Dry-Dock Co., supra* at 819–820; *Swenson v. The Argonaut*, 204 F.2d 636, 640 (3rd Cir. 1953); *The Chickie*, 141 F.2d 80, 82 (3rd Cir. 1944); *General Public Warehouse Co. v. Queen Line, Ltd., supra.*

Maritime law has established the basic rule that when a moored vessel breaks loose, drifts and sinks, the owner who had custody and control of the vessel, as Osage admittedly did, is required to explain that the sunken wreck did not occur through its fault.

The only proof offered by Osage that the drifting and sinking of Barge 417 was not its fault were the opinions of its vice-president and the diver he hired. I do not think opinion evidence of non-negligence is sufficient to overcome the presumption. Osage has not proved by any direct or sufficient circumstantial evidence that the drifting and sinking of Barge 417 was the result of a non-negligent accident or vandalism. Hence, the presumption of negligence on the part of Osage has not been rebutted.

The defendant contends that the sunken Barge 417 did not constitute an obstruction in navigable waters or a hazard to navigation and, therefore, for this reason the barge could not be removed by the government at the defendant's expense. (See defendant's Conclusion of Law No. 13). I do not agree. The phrase "navigable channel" as used in the Act is not limited to those deeper channels marked by buoys and used by larger vessels. *Red Star Towing & Transportation Co. v. Woodburn*, 18 F.2d 77 (2d Cir. 1927). A vessel may navigate at any part of a river containing navigable waters. *Jones Towing, Inc. v. United States*, 277 F.Supp. 839, 848 (E.D.La.1967), including an anchorage area, *Seeley v. Red Star Towing & Transp. Co.*, 396 F.Supp. 129, 132 (S.D.N.Y.1975). See also *Reading Co. v. Pope & Talbot, Inc.*, 192 F.Supp. 663 (E.D.Pa.1961); *American Dredging Co. v. Calmar S.S. Corp.*, 121 F.Supp. 255, 263 (E.D.Pa.1954), aff'd 218 F.2d 823 (3rd Cir. 1955). Thus Barge 417, lying submerged in water 10 or 12 feet deep, struck by M/V Three Rivers presented a hazard and obstruction to users of the river and was a hazard and obstruction to navigation.

The plaintiff wants not only to recover the cost of removal in the amount of $19,091.98, less the salvage value in the amount of $1,360.14, but it also wants the court to impose a penalty of not more than $2,500 or less than $500 upon Osage. 33 U.S.C. §§ 411 and 412. As heretofore stated, I think the latter claim is not warranted and is unjustified. See fn. 2. This action is *in personam* and not *in rem* as in the cases cited by plaintiff, i. e., *United States v. Ohio Valley Co.*, 510 F.2d 1184, 1185 (7th Cir. 1975); *United States v. The Republic No. 2*, 64 F.Supp. 373, 377 (S.D.Tex.1946). The penalty specified in § 411 is mandatory only in an *in rem* action against the vessel under § 412. No indictment or information has been filed against Osage which would warrant imposing the fine set forth in § 411. Even if a criminal action had been instituted, it is extremely doubtful that a conviction could be sustained on a bare presumption of negligence. *Cf. United States v. Raven*, 500 F.2d 728, 732–733 (5th Cir. 1974).

I find the fair and reasonable removal cost to be $5,700 which, together with the salvage value of $1,360.14 received by the plaintiff, makes a total recovery for the cost of removal in the amount of $7,060.14. I think interest should be awarded to plaintiff at 6% from the date of the bill the Engineers sent to the defendant on July 22, 1974 (PX 20).

Defendant's witness, Elmer P. Grimm, is an admittedly reputable and competent salvage contractor. (Tr. 342). Mr. Grimm has been raising sunken vessels in the rivers

around Pittsburgh since 1946 and has salvaged approximately 100 barges. He testified that if asked he would have been interested in bidding on raising Barge 417.[4] (Tr. 296).

The actual cost of removal incurred by the plaintiff was not proved; several items were estimated. Whereas, Mr. Grimm testified that he could have removed the barge in two and one-half days with 5 men including himself, the plaintiff took five days and engaged 38 men. We think the extra time and personnel were grossly excessive and unnecessary and the total sum demanded is unfair and unreasonable. If the plaintiff had taken bids as authorized, it could have determined what the reasonable cost of removal should have been. But as Mr. Eugene Homyak, Chief of Plant Section, testified, the government does not attempt to make its rates competitive with the rates charged by river salvage contractors. It appears that plaintiff desired to log as much time as possible for its employees, plant and equipment.

The foregoing shall be deemed to constitute the findings of fact and conclusions of law required by Rule 52 Fed.R.Civ.P.

An appropriate order will be entered.

---

4. The government has the right under the Act to solicit proposals for the removal of vessels and award a contract to the bidder "making the proposition most advantageous to the United States." § 414.