**UNITED STATES of America**

v.

**NASSAU MARINE CORP., et al.**

**Civ. A. No. 82–1088.**

United States District Court,
E.D. Louisiana.

Jan. 11, 1984.

Robert R. Rossi, Thomas W. Osborne, U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Edward J. Koehl, Jr., New Orleans, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

THE PARTIES

1. The United States Government petitions this court for an injunction mandating defendants to remove a tank barge which sank on March 23, 1979, from navigable waters of the United States, and, alternatively, for a declaratory judgment that defendants are responsible for all removal costs which the United States may incur should it remove the barge itself; for its costs in marking the barge from the inception of such marking to the removal of the barge; and, finally, for a declaratory judgment that the defendants are responsible for any and all damages which may be caused to others by the continued presence of the barge in a navigable waterway.

2. Defendants, all corporations doing business in the State of Louisiana, are related to the action as follows:

Barge CBC–21, the sunken barge which is the central focus of this action, was owned at the time of sinking by Nassau Marine Corporation (Nassau), which was and is a wholly owned subsidiary of Canal Barge Company (Canal). The M/V CLARKE BERRY, the tow boat towing Barge CBC–21 when the barge sank, was owned at the time by Webster Marine Corporation (Webster), which was and is also a wholly owned subsidiary of Canal.

3. Barge CBC–21 and tow boat CLARKE BERRY were operated at the time of Barge CBC–21's sinking by Central Marine Service (Central) under a charter party with Canal. Canal and Central were and are sister corporations having common owners. Under the contract between the two corporations, Canal was responsible for maintenance of Barge CBC–21 and the CLARKE BERRY. The directors and officers of all four corporations—Nassau, Canal, Webster and Central—are, for all material purposes, identical.

THE BARGE CBC–21—STRUCTURE AND REPAIRS

4. Barge CBC–21 was some 20 years old at the time of its sinking, having been built in 1960. It is a steel welded tank barge 280 feet in length, 50.1 feet in width, 12.5 feet in depth, with a draft of 9 feet when loaded. It has two cylindrical insulated cargo tanks arranged lengthwise within a covered hopper compartment. The internal tanks were used for the carriage of molten sulphur at the time of the sinking.

5. As a tank barge carrying molten sulphur, Barge CBC–21 was required by law to be inspected and certified in accordance with U.S. Coast Guard regulations. 33 CFR Parts 30–40 and 157. Its last U.S. Coast Guard Certificate of Inspection was issued on June 30, 1978, at New Orleans and was to remain valid until June 30, 1980, assuming the barge passed any required intermediate safety inspections.

6. On March 8th and 9th, 1979, some two weeks prior to the sinking, Barge CBC–21 underwent shipyard work for what appears to have been routine maintenance on its hull. Avondale Shipyard's work order for repairs performed on the CBC–21 on March 8 and 9, 1979, specifies the following: knotch out and weld one $\frac{3}{8}'' \times 6'' \times 30''$ plate over hole in bottom plate at #2 vertical headlog channel on starboard side; repair three fractures in starboard side shell 6″ below deck just above rub bar; repair hole in bottom plate just forward and below No. 3 truss at third bottom longitudinal angle on starboard side; repair

fracture between No. 1 port and starboard bulkhead; repair holes located at stern transome. The work was completed within two days and the barge was returned to service. These repairs were completed without notification, supervision or inspection by cognizant U.S. Coast Guard personnel.

## THE SINKING

7. At approximately 11:00 a.m., March 23, 1979, the CLARKE BERRY with tank barge CBC–21 in its forward tow departed Pensacola, Florida, en route to Port Sulphur, Louisiana, via the Gulf Intracoastal Waterway. It had just been loaded with approximately 2500 tons (8800 barrels) of molten sulphur at 280°F.

8. At approximately 8:15 p.m. of the same day, the tow boat and barge were proceeding at some seven miles per hour in a westerly direction across lower Mobile Bay, Alabama, directly between the Pensacola-Mobile Light 147 on the eastern side of the bay and Pass Aux Heron Light 2 some 8.7 miles away on the western side of the bay.

9. When the vessels had completed some 6.1 miles of this 8.7 mile distance and were crossing the north-south Mobile Ship Channel, the tank barge began buckling amidships. The tow boat continued to push the tank barge westward on its intended course in order to clear the ship channel while the barge continued to buckle and began producing a heavy vapor as the molten sulphur was exposed to the bay water.

10. The Barge CBC–21 sank on its intended course to Pass Aux Heron Light 2 at a point some 500 yards west of the ship channel and some 6.4 miles west of Pensacola-Mobile Light 147 at Latitude 30–17N, Longitude 88–02–30W.

11. The weather at the time of the barge's sinking was clear with winds gusting to 25–30 miles per hour out of the West-Northwest with a three foot chop. The weather was normal for the time and place and was not a factor in the sinking of the barge.

## THE PROBLEMS POSED BY THE SUNKEN BARGE

12. Barge CBC–21 remains today where it sank on March 23, 1979. The bottom of its buckled mid-section rests on the bay floor and its stern and bow protrude above the water's surface.

13. In practical terms, the barge is located directly on top of the cross-roads of Mobile Bay water-borne vessel traffic. It lies within several hundred yards of the intersection of the Mobile north-south deep draft ship channel and the east-west Gulf Intracoastal Waterway. The waters in which the barge lies, and within a radius of at least two miles from the barge, vary in minimum depth from 12–15 feet. Because of their central location and depths involved, the waters in this sector are capable of, and do, in fact, support extremely heavy traffic during both day and night. Pleasure boats of all kinds traverse these waters as do a wide variety of commercial craft. That Barge CBC–21 must be continually marked and should be removed cannot seriously be questioned.

## BARGE OWNER'S ABANDONMENT

14. Following the sinking of the barge, the tow boat CLARKE BERRY contacted the Coast Guard and remained alongside the barge in order to keep the wreck lighted for the protection of other mariners. On the following morning, March 24, 1979, a fishing vessel hired by the owners of Barge CBC–21 arrived to keep the barge marked and lighted.

15. On March 27, 1979, four days after the casualty, defendant Nassau sent a letter to the officials of the Coast Guard and Army Corps of Engineers which identified itself as the owner of Barge CBC–21 and disclaimed any further responsibility for the vessel as follows:

> Please take notice that the Barge CBC–21, Official Number 282692, and owned by Nassau Marine Corporation, buckled and sank on March 23, 1979. Said barge is in a sunken position down at the middle with the bow and stern ends sticking out of the water located approximately 2½ to 3 miles off Dauphine Island and

approximately ½ mile east of the Mobile Ship Channel.

As owners of the Barge CBC–21, we do hereby abandon all rights, title and interest in said vessel to the United States. We have a shrimp trawler standing by the sunken barge and are proceeding to mark same with the appropriate buoy and lighted lanterns. We assume that upon your receipt of this abandonment, you will continue to maintain those markings in effect.

We have no intention of attempting a salvage of the barge or doing anything whatever in connection with the vessel or its wreckage and assume that your office will take whatever further steps are necessary.

16. The District Engineer, Mobile District, U.S. Army Corps of Engineers, responded to Nassau's letter of abandonment with a reply dated May 22, 1979. This letter advised Nassau that its barge had been determined to constitute a hazard to navigation, that the Corps of Engineers would not accept the abandonment and that Nassau bore a continuing duty to mark the barge and commence its removal. The letter also advised that should Nassau fail in its duty to remove the barge and the United States were to effect such removal, the costs of removal would be assessed against the corporation.

17. As soon as the location of the wreck had been verified and the danger posed by the sunken barge had been determined, the Corps of Engineers issued a work order to the Coast Guard command responsible for maintaining aids to navigation in Mobile Bay requesting the placement of a temporary buoy at the wreck site. The commanding officer of the Coast Guard buoy tender in charge of routine maintenance of these aids testified that this temporary buoy had to be replaced several times—apparently because of collision damage. When the cost of maintaining the temporary buoy became too high, a permanent structure marking the location of the barge was erected. This structure was equipped with a quick flashing light due to the obvious dangers created by heavy vessel traffic. This permanent structure itself has been destroyed once.

### Conclusions of Law

1. This court has jurisdiction over this action under 28 U.S.C. § 1333(1) and 28 U.S.C. § 1345.

2. The Government asserts its rights and requested remedies against the defendants under various sections of the Rivers and Harbors Act. 33 U.S.C. § 403, et seq. In order to assess the significance of this Act, we need carefully to examine Sections 10 and 15 of the Rivers and Harbors Act, 33 U.S.C. §§ 403, 409.

3. Section 10 of the Rivers and Harbors Act, 33 U.S.C. Sec. 403, provides in pertinent part:

> The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, ... except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army.

Section 12 of the 1899 Act both provides the criminal penalty for a violation of Section 10 and authorizes the United States to enforce by injunction "the removal of any structures" erected in violation of Section 10.

4. Section 15 of the Rivers and Harbors Act, 33 U.S.C. § 409, specifically deals with obstructions created by sunken vessels, and provides in part:

> It shall not be lawful ... to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels.... And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy ... until the sunken craft is removed or abandoned ... and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and

failure to do so shall be considered an abandonment of such craft, and subject the same to removal by the United States. . . .

The phrase "voluntarily or carelessly" of Section 15 has been interpreted to mean "intentionally or negligently." *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); *University of Texas Medical Branch at Galveston v. United States*, 557 F.2d 438, 444 (5th Cir.1977); *United States v. Ohio Valley Company, Inc.*, 510 F.2d 1184, 1188 (7th Cir.1975).

5. Although the 1899 Act specifically addresses the problem of sunken vessels in Section 15, 33 U.S.C. § 409, the Fifth Circuit Court of Appeals has held that Section 10's prohibition of "obstructions" includes sunken vessels. *United States v. Cargill, Inc.*, 367 F.2d 971, 975 (5th Cir.1966); *Wyandotte Transportation Co. v. United States, supra; United States v. Raven*, 500 F.2d 728, 731 (5th Cir.1974); *University of Texas Medical Branch at Galveston v. United States, supra*, at 443. As has been recognized, however, the Fifth Circuit's approach to Section 10 presents certain problems. The court itself in *The University of Texas Medical Branch at Galveston v. United States, supra*, at 443–4, n. 10, states:

> As we shall see, Section 15 makes unlawful only the negligent sinking of a vessel, thereby obstructing navigable waters. By its terms, Section 10 would prohibit even the innocent creation of such an obstruction. Our cases have not addressed the anomaly caused by construing a general statute, Section 10, as apparently creating a strict liability offense for conduct that a specific statute, Section 15, proscribes only if it is negligent.

At any rate, it is my view that the provisions of Section 15, 33 U.S.C. § 409, will apply to the facts before me.

■ 6. The remedies available to the United States for violation of Section 15 of the Act fall into two categories—those expressly granted by the statute and those which have been implied. Statutory remedies include Section 16 of the Act, 33 U.S.C.

§§ 411 and 412, which provides for criminal fines and civil penalties for violation of Section 15. Sections 19 and 20 of the Act, 33 U.S.C. §§ 414 and 415, authorize the government to remove wrecked vessels in which the owner's rights have been deemed abandoned or in which summary removal is necessary, and entitle the United States to the proceeds of later sale of the removed vessel. Implied remedies of the Act, as determined by the Supreme Court in *Wyandotte Transportation Co. v. United States, supra*, include injunctive relief, declaratory relief and money damages.

■ The *Wyandotte* court established the rule that abandonment by the owner no longer shields him from liability under the Act if the sinking was due to the owner's negligence: "There is no indication anywhere . . . that Congress might have intended that a party who negligently sinks a vessel should be shielded from personal responsibility." 389 U.S. at 200, 88 S.Ct. at 385.

■ On the other hand, the owner of a vessel sunk without any negligence on his part is still subject to the statutory obligation· to remove the wreck, but may elect to raise the vessel himself and seek recovery of the expenses from the party responsible for the sinking, or he may abandon the vessel and allow the United States to bear the burden of removal. "If the non-negligent owner exercises his right to abandon, he is liable neither for the cost of removal nor for damages suffered by third parties as a result of the wreck." *Bunge Corporation v. Agri-Trans Corporation*, 542 F.Supp. 961, 969 (N.D.Miss.1982). See, also, *United States v. Osage Co., Inc.*, 414 F.Supp. 1097, 1101 (W.D.Pa.1976); *Lane v. United States*, 529 F.2d 175, 177 (4th Cir. 1975).

7. Thus, the stage is set for the case presently before us. The disposition of this matter pivots on the question of negligence. If the Barge CBC–21 sank as the result of defendants' negligence, the Government must prevail. The barge owner would have no right to abandon the vessel and the Government can avail itself

of the statutory and implied remedies mentioned above to effect the removal of the barge from its waters. This is so because denial of such remedies "would permit the result, extraordinary in our jurisprudence, of a wrongdoer shifting responsibility for the consequences of his negligence onto his victim." *Wyandotte*, 88 S.Ct. at 387. See, also, *United States v. Republic Steel Corp.*, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960).

If, however, the barge did not sink as the result of negligence on the part of the defendant, the language of Section 15, 33 U.S.C. § 409, is clear. Owners of ships which sink without fault may abandon the vessel to the United States who must then bear the costs of removal.

8. The Government, seeking to equate unseaworthiness with negligence, contends that a vessel underway at normal speed in fair weather and seas, which breaks up without explanation, is presumed to be unseaworthy. See, *e.g., Commercial Molasses Corp. v. New York Tank Barge Corp.*, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89 (1941); *Reisman v. New Hampshire Fire Insurance Co.*, 312 F.2d 17 (5th Cir.1963); *Walker v. Harris*, 335 F.2d 185 (5th Cir. 1964).

9. Then, focusing on a specific contention of negligence, the Government next seeks a presumption of fault based upon the showing that uninspected repairs were made on Barge CBC–21 two weeks before the sinking. They contend that Section 30.01–10 of 46 C.F.R. is applicable and that any repairs to the barge, whether major or minor, must have been made under the supervision of U.S. Coast Guard marine inspection personnel. The Government concludes that the violation of 46 C.F.R. Section 30.01–10, a navigation safety regulation, by the owners and operators of CBC–21 gives rise to the rule of fault promulgated in *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874). They contend that the *Pennsylvania* rule establishes a presumption that the failure to obey such regulations is presumed to be a contributing cause of the casualty, and the burden of "showing that it was in no de-

gree occasioned by that failure rests upon" the offender. 86 U.S. at 137–138.

10. Evidence introduced at trial regarding the causal relationship between the uninspected repairs and the subsequent sinking of the barge was inconclusive. Defendant's marine surveyor and the Government's naval architect both testified that they could not state in certain terms the relationship between the two events.

11. The defendant contends that it has successfully rebutted any inference of negligence under the *Pennsylvania Rule* because the Government can not prove that the sinking of the CBC–21 was the result of the violation of a particular Coast Guard regulation. I agree that the *Pennsylvania*, standing alone, may not conclusively establish fault on the part of the defendant. Here, however, that doctrine of admiralty is augmented by a related presumption of negligence which I find has applicability to the unique circumstances of this case—the theory of *res ipsa loquitur*. Thus, concerns regarding the sufficiency of the presumption of negligence resulting from the application of the *Pennsylvania* rule are diminished when that presumption is considered along with the application of the *res ipsa* doctrine.

12. That res ipsa loquitur has application in a cause of action arising in admiralty is well settled. See, *e.g., Johnson v. U.S.*, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468 (1948); *Higginbotham v. Mobil Oil Corp.*, 357 F.Supp. 1164 (W.D.La.1973), supplemented 360 F.Supp. 1140, affirmed in part, reversed in part, 545 F.2d 422; *United Fruit Co. v. Marine Terminal Corporation*, 376 F.2d 1007 (9th Cir.1967).

The applicability of *res ipsa* to any fact situation depends upon whether each of three elements can be shown: (1) that the injured party was without fault, (2) that the instrumentality causing the injury was under the exclusive control of the defendant, and (3) the mishap is of a type that ordinarily does not occur in the absence of negligence. *Johnson v. United States, supra; Higginbotham v. Mobil Oil Corp.,*

*supra; United States v. Chesapeake & Delaware Shipyard, Inc.*, 369 F.Supp. 714 (D.Md.1974).

The court in *Chesapeake & Delaware Shipyard, Inc., supra,* applied *res ipsa* to find an inference of negligence on the part of a barge owner in a suit for removal costs under Section 409. That court was also confronted with an inexplicable barge sinking where no direct proof as to causation could be made. After determining that the three criteria of the doctrine as described above had been satisfied, the court concluded, "(t)he legal effect ... is that the fact finder is warranted in inferring that the defendant was negligent. In the oft-quoted language of the Supreme Court:

> ... *res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient.... (*Sweeney v. Erving*, 228 U.S. 233, 240, 33 S.Ct. 416, 418, 57 L.Ed. 815 (1913).)."

369 F.Supp. 719.

13. Applying the facts of the present case to the test outlined above, I conclude that the three elements are satisfied. It has not been, nor could it be contended that the Government had any role, whatsoever, in the sinking of the CBC–21. Nor can it be questioned that the barge was within the exclusive control of the defendant. (Insofar as the "owner" of Barge CBC–21 might place fault in the negligence or unseaworthiness of the towboat CLARKE BERRY, the legal effect is of no moment given the familial relationship of the corporate defendants.) It is stipulated by the parties that the weather over Mobile Bay on the day of the barge's fateful voyage was fair and clear. The entire incident occurred in a matter of minutes and to this date no one involved has a satisfactory explanation as to what might cause a seemingly seaworthy, 280 foot steel hull barge to buckle amidships in fair seas. Such an incident does not ordinarily occur absent negligence.

14. The court finds as a matter of law that both the theory of *res ipsa loquitur* and the factual presumption of fault supplied by the *Pennsylvania* rule are properly applicable to the facts of this litigation. Once the inference of negligence has been established, the burden of proof shifts to the defendant, who must rebut the presumption or run the risk of non-persuasion. *United States v. Chesapeake & Delaware Shipyard, Inc., supra,* at 719. In his defense, the owner of the vessel has a heavy burden to prove that the sinking of his barge was the result of *vis major,* inevitable accident, or the acts of a third party. *United States v. Osage Co., supra,* at 1102. Opinion evidence of non-negligence is not sufficient to rebut the presumption. *Id.* at 1102.

15. In the instant case, defendant owners and operators of Barge CBC–21 have not overcome the presumption that the barge sank due to their own negligence. Defendants claim that due care was taken in the maintenance and operation of the CBC–21. Testimony that due care was used will not in itself eliminate the inference of negligence arising under the doctrine of *res ipsa loquitur* or the rule of fault as established in *The Pennsylvania, supra.*

16. It is now well established that a vessel which sinks due to the negligence of its owner, and which constitutes an obstruction to the navigable waters of the United States, can not be abandoned. Section 409 of the Act requires that the negligent owner either remove the obstruction or reimburse the United States for the cost of doing so.

Based upon Section 15 of the Rivers and Harbors Act of 1899 and the facts of this case, this court finds:

a. that the United States is entitled to judgment against the defendants, jointly and severally, for its costs in marking Barge CBC–21 from the inception of such marking to the removal of Barge CBC–21;

b. that the United States is entitled to an injunction mandating defendants, jointly and severally, to remove Barge CBC–21 from navigable waters of the United States;

c. that the United States is also entitled, in the alternative, to a declaratory judgment that defendants, jointly and severally, are responsible for all removal costs which the United States may incur should it remove Barge CBC–21.

Plaintiff is directed to prepare a judgment consistent with these findings.