BARRY, Judge.
This tort action arises out of plaintiff’s death from electrocution which occurred while installing an air-conditioning motor.
Michael Carollo agreed to repair Edward Newton’s home central air-conditioning system. Carollo arrived around 10 a.m. and was met by Bernie Smithe, Newton’s room *207 mate. After removing fuses to the outside condenser, but not those controlling electrical power to the attic, Carollo determined that the air-handling unit in the attic had a defective motor. Smithe helped him unscrew three mounting arms and remove the Emerson three speed single rotation, 240 volt motor and bracket. Carollo brought the motor and bracket to G & M Sales, Inc. where Thomas Baudoin, a clerk, agreed to adapt a new A.O. Smith 240 volt three speed reverse rotation motor to replace the Emerson. Several hours later Carollo returned and Baudoin ran the Smith motor in Carollo’s presence, explained the interchangeability of the rotation and speed leads, and wrote installation instructions on the sales receipt.
Carollo went back to the home around 3:00 p.m. and had difficulty mounting the motor. Smithe suggested on three occasions that electricity to the attic be disconnected, but Carollo said, “It isn’t necessary.” A fuse box in the garage and a toggle switch near the motor controlled power to the motor.
Newton arrived home around 5:45 p.m. and Carollo asked him to plug in the fuses to the condensing unit. About that time Newton heard a scream, immediately removed the fuses, ran upstairs and found Carollo, soaked with perspiration, lying on his left side facing the air-handling unit with his back against the metal duct work. He was grasping the ends of two wires between his left thumb and forefinger and his right arm was up in the air. An autopsy concluded the cause of death was electrocution.
Carollo was 61 years old and had retired seven years earlier from U.S. Gypsum. He attended air-conditioning courses for two years at Delgado College and did repair work as a paying hobby. He was not a certified electrician or experienced in central air systems.
Carollo’s widow and three adult children filed suit against Newton, his homeowner’s insurer, G & M Sales, Inc., and the A.O. Smith Corp. The jury returned a unanimous verdict in favor of all defendants.
STRICT LIABILITY
The Carollos contend the trial court erred by failing to charge the jury or submit an interrogatory on the homeowner’s strict liability, hence, the jury did not consider Newton’s liability based on the alleged defective condition of his house. La. C.C. Arts. 2317 and 2322.[1] The Carollos claim the 18 inch space between the duct and the blower’s access panel created a “trap” and was a violation of the 30 inch requirement of the National Electric Code which is part of the New Orleans Building Code. Their expert electrical engineer, Bruce Barton, testified that the space was not in compliance with the Code.
Newton responds that strict liability is inapplicable since no vice or defect caused the accident.
Three days after the accident George Hero, an expert electrical engineer, checked the junction box, capacitor, motor, and all groundings and found no defect. He said the location of the duct did not violate the electrical code. He testified that power to the outside condenser unit (which Carollo had disconnected) was not connected to the motor; therefore, when Newton replaced the fuses, it did not energize the wires in Carollo’s hand. Dr. Eugene F. Tims, another expert electrical engineer, agreed the space between the duct work and motor did not violate the electrical code.
Loescher v. Parr, 324 So.2d 441 (La.1975) sets forth the following conditions for C.C. Art. 2317 to apply: 1) the thing which caused the damage was in the care and *208 custody of the defendant owner; 2) a defect or vice of the thing; and 3) the damage that occurred was a result of the defect or vice. The “vice” is that which poses “an unreasonable risk of injury to another.”
To recover under C.C. Art. 2317 or Art. 2322, there must be a defect. O’Neal v. International Paper Co., 715 F.2d 199 (5th Cir.La.1983).
The Carollos simply could not prove that the air duct’s proximity to the motor’s panel was a vice which posed an unreasonable risk of injury that caused Carollo’s death.
Plaintiffs argue that victim fault doesn’t apply when a person is killed in an accident and unable to testify. They claim a presumption because of the “instinct of self-preservation and love of life that the decedent was not negligent and acted with ordinary care for his own safety.” Unfortunately, Carollo failed to disconnect the electricity from the main box or toggle switch, a basic act which would have avoided the accident. Carollo’s negligence caused his death.
After hearing the facts the trial judge correctly refused to instruct the jury on C.C. Arts. 2317 and 2322 and the jury properly exonerated Newton.
RES IPSA LOQUITUR
The Carollos contend the cause of the fatality was a defective electrical circuit, negligent modification of the motor, and/or a defective motor, and it was error not to instruct the jury on res ipsa loqui-tur.
All defendants argue res ipsa loquitur is inapplicable because the doctrine requires “exclusive control” and the motor was not in their control at the time of the accident,
Carollo was alone in the attic working on the motor when the accident happened. The equipment and repairs were in his exclusive control. Smithe testified that he asked Carollo three times if he should disconnect the electricity and Carollo said it was not necessary because he could work around it.
Carollo was not a certified electrician and the record shows that most of his experience was repairing window units. The motor manufacturer’s instructions were printed on the name plate and installation was explained by Baudoin orally and in writing.
Res ipsa loquitur applies when: 1) the defendant had exclusive control over the area; 2) the cause of the accident is more properly within the knowledge of the defendant; and 3) all the facts and circumstances indicate that the negligence of the defendant, rather than the negligence of others, is the most likely cause of the accident. U.S. v. Nassau Marine Corp., 577 F.Supp. 1475 (E.D.La.1984), affirmed 778 F.2d 1111 (5th Cir.La.1985); Greenup v. Maginnis, 446 So.2d 485 (La.App. 4th Cir.1984).
It is uncontroverted that Carollo did not take the basic precaution of turning off the electricity and that negligence was the most likely cause of the accident. He worked alone and maintained “exclusive control”, thus it was proper to refuse the jury charge on res ipsa loquitur.
MODIFICATION OF MOTOR
The Carollos contend Baudoin, the G & M clerk, failed to “bring out” the high speed lead to conform with the Emerson motor rotation and to electrically insulate and tie off the medium and low speed leads.
G & M argues Carollo was at fault for failing to disconnect the power source. It maintains that it is not customary to cut and/or tie off leads unless requested by the customer. Plaintiffs claim, without support, that Carollo asked Baudoin to insulate and tie off the leads.
When questioned about his discussion with Carollo, Baudoin testified:
I told him what I would do would be to drill the holes to match the bracket that was on the Emerson motor. I would match the bracket to fit on the A.O. Smith motor. And what I told him I would do, we’ll adapt it to do the work on *209 it. I would set up his rotation to get the right rotation. I would bring out the right number of leads. I told him I would do that.
George Pappas, owner of G & M Sales since 1946, testified:
There’s various types of motors. Some motors have the leads coming out from the factory and some are encased in a little box on the side of the motor. And “brining (sic) out the right lead” you take the cover off of the little box and bring the leads out.
Morris Daniels, an air-conditioning repairman with thirty six years experience, testified “the longer the lead the better” since spliced wires can be the “cause of problems further down the road.” Dr. Tims agreed that whenever wires are spliced there is an increased fire potential.
There is no evidence that Carollo asked Baudoin to cut, tie off, insulate, or otherwise modify any of the leads. Baudoin agreed to drill the motor casing for the bracket, set the rotation, and “bring out the leads” which had nothing to do with insulating or tying them off.
The jury reasonably concluded that G & M Sales was not negligent.
PRODUCT LIABILITY
The Carollos contend A.O. Smith Corp. is liable for manufacturing a motor with an excessive number of leads (eight). They claim Emerson and General Electric motors are safer because both have fewer leads. It is their contention the Smith motor was defective because the risk of electrical shock exceeds the utility of the extra leads.
Smith argues the motor was not defective and neither General Electric or Emerson motors are as safe or efficient.
General Electric’s design involves four short leads, each connected by a pair of plastic covered plugs. According to Dr. Tims’ uncontradicted testimony, this design constitutes a “serious defect” because of the “increased probability of a fire hazard” due to the plastic covered male/female connectors.
The faulty Emerson motor removed from Newton’s attic had a single wire which was plugged into one of three receptacles depending upon the speed desired. Pappas testified this motor was at least fifteen years old and the leads of motors currently manufactured by Emerson and other companies are designed like those of the Smith Corp. He stated that Emerson’s later design changed because its former configuration involved a greater risk of fire due to loose connections.
The Smith motor functioned perfectly several times when Baudoin demonstrated it for Carollo. Three days later it was tested by Hero. It was checked by G & M Sales and found to be in perfect condition. It was examined twice by Bruce Barton, the Carollos’ expert electrical engineer, and found to be “good in every shape, way and form.” Tests were performed involving the use of an ohm meter to uncover shorts and designed to determine the “average reading on the current consumed with the motor running under load”. On each occasion the motor was determined to be in proper operating condition, clearly establishing that it was neither defective nor the cause of Carollo’s death.
A defect cannot be presumed solely from the fact that an accident occurred. Broussard v. Pennsylvania Millers Mutual Insurance Co., 406 So.2d 574 (La.1981). In order to establish the existence of a defect in a products liability case, the plaintiff must prove that the product was defective, unreasonably dangerous to normal use, and plaintiff’s injuries were caused by the defect. Weber v. Fidelity and Casualty Insurance Co. of New York, 259 La. 599, 250 So.2d 754 (1971).
The jury correctly found A.O. Smith Corp. not liable.
The Carollos raise several other specifications which they concede do not constitute reversible error. We agree.
*210 The jury had no alternative but to conclude that Mr. Carollo’s negligence caused his tragic death.
AFFIRMED.

. La.C.C. Art. 2317 in pertinent part provides: We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.
C.C. Art. 2322 provides:
The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction.